SUMMIT TECHNOLOGY, INC., Plaintiff,

v.

HIGH–LINE MEDICAL INSTRUMENTS COMPANY, INC., et al., Defendants.

No. CV95–6491 ABC (SHx).

United States District Court, C.D. California.

Feb. 28, 1996.

Blanc Williams Johnston & Kronstadt, John A. Kronstadt, John C. Rawls, Cynthia S. Arato, Mona D. Miller, Los Angeles, CA, for plaintiff.

Foley Lardner Weissburg & Aronson, James R. Kalyvas, Shana T. Torem, Los Angeles, CA, for Hi–Line Medical.

Blecher & Collins, Maxwell Blecher, Alicia Rosenberg, William C. Hsu, Los Angeles, for Kenneth York/York Lago Eye Center.

Alioto & Alioto, John Alioto, Linda Alioto, San Francisco, CA, for William Ellis/Eye Center of No. Calif.

## ORDER RE: DEFENDANTS' MOTIONS TO DISMISS

COLLINS, District Judge.

Defendants' motions to dismiss came on regularly for hearing before this Court on February 5, 1996. After reviewing the materials submitted by the parties, argument of counsel, and the case file, it is hereby ORDERED that Defendants' motions are GRANTED.

### I. Background

This case concerns a dispute over the use and distribution of "excimer" laser devices used by opthamologists in laser eye surgery. Plaintiff SUMMIT TECHNOLOGY, INC. ("Summit") is a Massachusetts corporation that develops, manufactures, sells, and services laser systems for opthamologists. These laser systems can be used to correct a variety of vision disorders such as myopia, astigmatism, farsightedness, or cataracts. Summit holds a registered trademark in the name "Summit Technology." (Trademark No. 1785393).

On September 28, 1995, Summit filed a Complaint against Defendants HIGH–LINE MEDICAL INSTRUMENTS COMPANY, INC., d/b/a HI–LINE MEDICAL ("Hi–Line"), KENNETH K. YORK and YORK LASER EYE CENTER ("York" Defendants), WILLIAM ELLIS and EYE CENTER OF NORTHERN CALIFORNIA, INC. ("Ellis" Defendants), and PARIS E. ROYO, PARIS E. ROYO, INC. and ROYO EYE CENTER MEDICAL GROUP ("Royo" Defendants). Essentially, Summit asserts that Defendants have unlawfully imported, advertised, promoted, used, or serviced Summit Excimer Laser Systems which have not been approved by the United States Food and Drug Administration ("FDA"). The Complaint asserts causes of action for false and misleading advertising under § 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) (against all Defendants), importation of goods bearing infringing marks or names (15 U.S.C. § 1124) (against Hi–Line), infringement of a registered trademark (15 U.S.C. § 1114) (against Hi–Line and York), copyright infringement (against Hi–Line), a second count of copyright infringement (against York, Ellis, and Royo), unfair competition in violation of Cal.Bus. & Prof.Code § 17200 (against all Defendants), common law unfair competition (against all Defendants), false and misleading statements in violation of Cal.Bus. & Prof.Code § 17500 (against all Defendants), and violation of the Sherman Food, Drug, and Cosmetic Law (Cal.Health & Safety Code §§ 26000–26851. The substance of these allegations will be addressed in further detail below.

On November 20, 1995, Defendant Hi–Line and the York Defendants filed separate motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). On the same date, the Royo Defendants filed a motion to dismiss, or in the alternative, a motion for summary judgment. The Ellis Defendants filed another motion to dismiss on November 21, 1995. On December 22, 1995, Summit filed a Consolidated Opposition to these motions to dismiss. This Opposition was filed under seal, subject to a protective order. On January 22, 1996, the York Defendants and Hi–Line filed separate Reply briefs. Neither the Ellis Defendants nor the Royo Defendants have filed Reply briefs. On Friday, February 2, 1996, the Court received word that Plaintiff and the Royo Defendants had reached a tentative settlement. Because of

**302**

this, the Court will not address the Royo motion.

## II. Plaintiff's Allegations

As stated above, Summit is a Massachusetts corporation that develops, manufactures, sells, and services opthamological laser systems for treatment of a variety of eye disorders. Compl. ¶¶ 14 & 24. Summit holds a registered trademark in the name "Summit Technology." Compl. ¶ 26. In the past decade, Summit has manufactured and sold a variety of optic laser systems for use abroad and in the United States. The Summit Excimer Laser System's [1] multiple parts, housed in a single unit, include laser systems and motors that control the precise movements of the laser. In addition, the laser systems include copyrighted software which controls the operation of the laser. Compl. ¶ 25.

Until very recently, the Summit Excimer Laser System had not been approved by the Food and Drug Administration ("FDA") for use or distribution in the United States. The FDA has been considering commercial approval of the system for various surgical procedures for many years. During this period, the FDA has, however, permitted investigational use of the device at U.S. universities to facilitate data collection about the safety and effectiveness of the Excimer Laser System. Compl. ¶ 4. Pending FDA approval, Summit has successfully marketed earlier versions of the Summit Excimer Laser System (at issue in this case) in approximately 45 foreign countries, including Canada, Mexico, and several European nations. In many of these countries, the Summit Excimer Laser System is legally used to perform both photorefractive keratectomy ("PRK") and phototherapeutic keratectomy ("PTK"). Compl. ¶¶ 7 & 37.

On March 10, 1995, the FDA approved the Summit Excimer Laser System to perform commercial PTK in the United States. PTK is a therapeutic procedure for treating certain corneal pathologies, such as corneal opacities, growths or scars. Compl. ¶ 5. On September 18, 1995, Summit received formal notice that the FDA had approved the Summit Excimer Laser System to treat myopia with PRK. However, the FDA has not yet given final authorization for commercial use of the Summit Excimer Laser for PRK in the United States. Compl. ¶ 6.

According to the Complaint, the Summit systems sold in foreign countries differ significantly from the Summit system currently marketed in the United States (after FDA approval). For example, many of the foreign models are incapable of performing PRK with the six millimeter optical zone procedure required by the FDA. However, both the foreign and domestic models bear the same trademark, "Summit Technology." Compl. ¶ 40.

Defendant Hi–Line is a California corporation engaged in the business of buying and selling used medical equipment. Hi–Line has acquired legally exported Summit Excimer Laser Systems used in foreign countries and then re-imported or facilitated the re-importation of these systems for distribution in the United States. Hi–Line may also have acted as a broker, arranging or facilitating the sale of foreign Summit Excimer Laser Systems to domestic purchasers in exchange for monetary compensation. Compl. ¶ 41. Hi–Line has also advertised in the United States the availability of used Summit Excimer Laser Systems for purchase in this country. These advertisements (one of which is attached as Exhibit C to the Complaint) feature allegedly unauthorized photographs of Summit Excimer Laser Systems. Compl. ¶ 42.

In some of its advertisements, Hi–Line includes a reprint of a trade press article, which features the banner headline: "FDA APPROVES SUMMIT EXCIMER FOR PTK" and states that the used Summit Excimer Laser Systems offered by Hi–Line are "perfectly reliable." The trade press article also refers to the expected future approval of the Summit Excimer Laser System for commercial PRK. Compl. ¶ 43. Plaintiff contends that Hi–Line's advertisements are false and misleading because they fail to disclose that the Summit systems sold by Hi–Line are not approved by the FDA for sale or use in the United States, and that the FDA

1. The Summit Excimer Laser Systems are the machines at issue in this case.

disapproves of the domestic use of re-imported Summit Excimer Laser Systems. In addition, Plaintiff asserts that Hi–Line's advertisements fail to disclose that the Summit systems sold by Hi–Line are materially different from Summit systems that have been approved for use in the United States. Finally, Plaintiff alleges that Hi–Line's advertisements are false and misleading because they do not disclose that Summit has not serviced or maintained the used Summit machines offered by Hi–Line. Summit contends that Hi–Line's false advertising has created (and is likely to create) consumer confusion, has eroded Summit's goodwill, and constitutes a danger to the public.

On April 28, 1995, the FDA sent a warning letter to Hi–Line concerning its re-importation and distribution of used Summit systems (attached as Exhibit D to the Complaint). The FDA warned Hi–Line that a re-imported Summit Excimer Laser System could not lawfully be offered for sale in the United States and that Hi–Line should not import any additional systems for commercial distribution. Compl. ¶ 45.

Defendant Kenneth K. York is a California physician who is apparently the principal of Defendant York Laser Eye Center (collectively "York"). Compl. ¶¶ 16–17. York acquired a used Summit system which Summit originally sold to a person or entity outside the United States. Compl. ¶ 48. York has promoted and advertised this fact by writing letters to other physicians advising them that he has purchased a Summit system and would like to make the system available to other qualified opthamologists, in exchange for a "user fee." (a copy of such a letter is attached to the Complaint as Exhibit E). Compl. ¶ 49. The Complaint alleges that the statements in York's letters are false and misleading in the same way that the Hi–Line statements are false and misleading. Compl. ¶ 50.

In addition, York has advertised the availability of PRK in magazines and newspapers and on billboards (copies of such advertisements are attached to the Complaint as Ex-

hibit F). These advertisements are directed primarily at prospective patients and state that the York Laser Eye Center is "the only fully operational, non-investigational laser center on the West Coast." The advertisements state that PRK is now available at the York Laser Eye Center. The advertisements further state that York is using "custom laser instrumentation" to perform PRK. Compl. ¶ 51. Summit alleges that York's advertisements are false and misleading and are therefore likely to cause consumer confusion, erode Summit's goodwill, and present a danger to the public.[2]

Defendant William Ellis is a licensed California physician who owns Defendant Eye Center of Northern California (collectively "Ellis"). Compl. ¶ 19. Ellis acquired a used Summit Excimer Laser System which Summit originally sold to a person or entity outside the United States. Compl. ¶ 55. Ellis has promoted and advertised his used Summit system by placing a radio advertisement (the transcript of the radio advertisement is attached to the Complaint as Exhibit G) stating that he is "the first in the Bay Area to have the Excimer Laser," and that he offers "Laser PTK." The advertisement also states that the FDA "has now approved the Excimer Laser for therapeutic use[.]" Compl. ¶ 56. On August 11, 1995, the FDA sent a letter to Ellis, warning him that his re-imported Summit system was not approved for commercial use in the United States. The letter is attached to the Complaint as Exhibit H. Compl. ¶ 57. Summit alleges that Ellis' advertisements are false and misleading, and therefore harmful in all the ways discussed above. Compl. ¶¶ 58 & 60.

Summit contends that all Defendants have made false statements that are likely to cause confusion, cause mistake or deceive as to the affiliation, connection or association of Defendants with Summit, or as to the origin, sponsorship or approval by Summit of Defendants' goods, services, or commercial activities, in violation of § 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) and Cal.Bus. & Prof.Code § 17500. Compl. ¶ 67. In addi-

---

**2.** However, because York is allegedly offering the services of a "custom" device, the allegations against York are somewhat distinct.

tion, Plaintiff alleges that Hi–Line has re-imported foreign versions of Summit's system, without Summit's authorization, that differ in material respects from the version sold by Summit in the United States. According to Plaintiff, Hi–Line's actions violate § 42 of the Lanham Act by causing the public to believe that the re-imported Summit systems sold by Hi–Line are the same as the Summit systems lawfully distributed in the United States. Compl. ¶¶ 72–73. Plaintiff also contends that Hi–Line and York have infringed Summit's registered trademark, in violation of § 32(1)(a) of the Lanham Act (15 U.S.C. § 1114(1)(a)), by importing, advertising, distributing, and using goods bearing the Summit mark. Compl. ¶ 78–79.

Further, Summit owns copyrights in the Summit software. On September 26, 1995, Summit filed an Application for registered copyrights in its computer programs, all of which had originally been published in 1989 and 1990. (Copyright registration applications are attached to Plaintiff's Complaint as Exhibit J). Compl. ¶¶ 84–85. Summit argues that Hi–Line has infringed Plaintiff's copyrights by importing copies of Summit software obtained in foreign countries into the United States without Summit's authorization, and then by selling or distributing the copies domestically. Compl. ¶ 86. York and Ellis also allegedly infringe Summit's copyrights by simply using the Summit laser system. Every time they turn on their Summit systems, the software is copied onto their Random Access Memory ("RAM") chips. Because York and Ellis are not so authorized, Plaintiff contends that this conduct violates Summit's copyrights. Compl. ¶¶ 91–94.

Finally, Summit alleges several claims based on state law, including causes of action for unfair competition and false advertising under Cal.Bus. & Prof.Code §§ 17200 & 17500 and common law. Compl. ¶¶ 98–101 & 107–09. In addition, Plaintiff contends that all the Defendants have violated the California Sherman Food, Drug, and Cosmetic Law (Health & Safety Code § 26000–26851). Compl. ¶¶ 119–21. Plaintiff seeks injunctive relief, damages, treble damages, recovery of profits, attorney's fees, and injunctive relief.

## III. Discussion

### A. Standard for Motion to Dismiss for Failure to State a Claim

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. Rule 12(b)(6) must be read in conjunction with Rule 8(a) which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990). A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir.1988).

A court must accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from them. *NL Industries, Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986); *see also Russell v. Landrieu,* 621 F.2d 1037, 1039 (9th Cir.1980) (finding that the complaint must be read in the light most favorable to the plaintiff). However, a court need not accept as true unreasonable inferences, unwarranted deductions of fact, or conclusory legal allegations cast in the form of factual allegations. *Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.), *cert. denied,* 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981); *Hiland Dairy, Inc. v. Kroger Co.,* 402 F.2d 968, 973 (8th Cir.1968), *cert. denied,* 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969).

Furthermore, unless a court converts a Rule 12(b)(6) motion into a motion for summary judgment, a court cannot consider material outside of the complaint (e.g., facts presented in briefs, affidavits, or discovery materials). *Levine v. Diamanthuset, Inc.,* 950 F.2d 1478, 1483 (9th Cir.1991), *overruled on other grounds by Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., et al.,* —— U.S. ——, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). A court may, however, consider exhibits submitted with the complaint and matters that may be judicially noticed pursuant to Federal Rule of Evidence 201. *Hal Roach Studios, Inc. v. Richard Feiner & Co.,* 896 F.2d 1542, 1555 n. 19

ilit_ the

(9th Cir.1989); *Mack v. South Bay Beer Distributors, Inc.,* 798 F.2d 1279 (9th Cir.1986), *abrogated on other grounds by Astoria Federal Savings and Loan Ass'n v. Solimino,* 501 U.S. 104, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991).

Lastly, a Rule 12(b)(6) motion "will not be granted merely because [a] plaintiff requests a remedy to which he or she is not entitled." Schwarzer, et al., *Civil Procedure Before Trial* § 9:230. "It need not appear that plaintiff can obtain the *specific* relief demanded as long as the court can ascertain from the face of the complaint that *some* relief can be granted." *Doe v. United States Dept. of Justice,* 753 F.2d 1092, 1104 (D.C.Cir.1985); *see also Doss v. South Central Bell Telephone Co.,* 834 F.2d 421, 425 (5th Cir.1987) (demand for improper remedy not fatal if claim shows plaintiff entitled to different form of relief).

**B. Analysis**

Before the Court are three separate motions to dismiss pursuant to Federal Rule 12(b)(6). However, because the motions overlap in many of their arguments, the Court will not address each motion separately. Rather, the Court will address each motion's arguments in the context of each cause of action.

**1. Plaintiff's First Cause of Action Against All Defendants for False and Misleading Statements (15 U.S.C. § 1125(a))**

■ Defendants have submitted several arguments as to why Plaintiff's first cause of action must be dismissed. First, all three Defendants contend that Plaintiff's first cause of action fails because it impermissibly attempts to redress alleged violations of the Federal Food, Drug, and Cosmetics Act ("FDCA") (21 U.S.C. § 301 *et seq.*), a function exclusively within the jurisdiction of the FDA. Second, Hi–Line asserts that its advertisements are, as a matter of law, not false and misleading under the Lanham Act. Third, Ellis contends that the first cause of

action must fail because of the so-called "First Sale" doctrine. Because the Court finds that Plaintiff's § 43(a) claim is essentially a claim under the FDCA, the Court need not reach the other arguments.

Under 21 U.S.C. § 337(a), the FDCA provides that "all such proceedings for the enforcement, or to restrain violations, of [the Act] shall be by and in the name of the United States." [3] Courts have generally interpreted this provision to mean that no private right of action exists to redress alleged violations of the FDCA. *See Gile v. Optical Radiation Corp.,* 22 F.3d 540, 544 (3d Cir.), *cert. denied,* — U.S. ——, 115 S.Ct. 429, 130 L.Ed.2d 342 (1994) (citing *Pacific Trading Co. v. Wilson & Co., Inc.,* 547 F.2d 367, 370 (7th Cir.1976) ("violations of the FDCA do not create private rights of action"); *Mylan Laboratories, Inc. v. Matkari,* 7 F.3d 1130, 1139 (4th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994) (citing the same principle); *Ginochio v. Surgikos, Inc.,* 864 F.Supp. 948, 956 (N.D.Cal. 1994) (citing various courts that have held that "there is no private cause of action for violation of the Food, Drug, and Cosmetic Act."). Rather, courts have found that the right to enforce the provisions of the FDCA lies exclusively within the federal government's domain, by way of either the FDA or the Department of Justice. *See Fender v. Medtronic, Inc.,* 887 F.Supp. 1326, 1329 (E.D.Cal.1995) (the FDCA "gives the FDA comprehensive regulatory authority over medical devices.").

In its Complaint, Plaintiff alleges that by failing to disclose that their re-imported used and/or modified Summit Excimer Laser Systems are not approved by the FDA, all Defendants have engaged in false advertising under § 43(a) of the Lanham Act. In addition, Plaintiff alleges that Defendants have unlawfully failed to disclose (1) that the used or modified systems are materially different from the FDA-approved systems; (2) that Summit has not serviced the machines and cannot do so under FDA regulations; (3) that proper maintenance and training is of

---

**3.** The only exception to this provision is that a state may "bring in its own name and within its jurisdiction proceedings for the civil enforcement, or to restrain violations ... if the food that is the subject of the proceeding is located in the State." 21 U.S.C. § 337(b)(1).

**306**

critical importance; and (4) that the Defendants cannot provide the required Summit service or training. Plaintiff's allegations all turn on whether Defendants have failed to disclose the allegedly illegal status of their re-imported systems, or whether Defendants have failed to disclose that, under FDA regulations, Summit has not been able to maintain the machines or train users.

After carefully reviewing the Complaint, the Court agrees with Defendants that Plaintiff's false and misleading advertising allegations circumvent 21 U.S.C. § 337(a)'s denial of a private right of action to enforce violations of the FDCA. Although there is no Ninth Circuit authority on point, the Court finds the Fourth Circuit's recent ruling in *Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130, 1139 (4th Cir.1993) extremely persuasive. In *Mylan,* the Fourth Circuit found that, absent an affirmative misrepresentation that a drug had been officially *approved* by the FDA, a Lanham Act claim alleging that the defendant had failed to disclose FDA non-approval could not stand. The court found that "permitting [plaintiff] to proceed on the theory that the defendants violated § 43(a) merely by placing their drugs on the market would, in effect, permit [plaintiff] to use the Lanham Act as a vehicle by which to enforce the Food, Drug, and Cosmetic Act ("FDCA") and the regulations promulgated thereunder." *Mylan,* 7 F.3d at 1139. To state a claim under § 43(a), the plaintiff was required to point to "*some* claim or representation that is reasonably clear from the face of the defendants' advertising[.]" *Id.* at 1139. Absent this, the Lanham Act claim strayed too close to the exclusive enforcement domain of the FDA.

The rationale of the *Mylan* rule applies forcefully in this case. In short, the FDA has not yet determined whether or not the re-imported Summit devices need further approval *at all.* It is evident from the Complaint (and the accompanying exhibits) that the FDA is continuing to investigate whether Defendants have actually violated FDA regulations by marketing the use of the re-imported machines. And, regardless of any warning letters that the FDA may have sent to Defendants, it is clear that the FDA has not completed this investigation. *See Dietary Supplemental Coalition, Inc. v. Sullivan,* 978 F.2d 560, 563 (9th Cir.1992), *cert. denied,* 508 U.S. 906, 113 S.Ct. 2333, 124 L.Ed.2d 245 (1993) (citing *Biotics Research Corp. v. Heckler,* 710 F.2d 1375, 1377 (9th Cir.1983) (holding that FDA regulatory letters do not constitute final agency action). Indeed, after further review, the FDA *could* ultimately decide that the re-imported systems are so similar to the approved domestic systems that further approval procedures are unnecessary. Plaintiff's Lanham Act cause of action would thus "usurp[ ] the FDA's discretionary role in the application and interpretation of its regulations." *Fender,* 887 F.Supp. at 1332. It would force this Court to rule on the legality of Defendants' conduct before the FDA has had a chance to do so.

■ As such, this would use the Lanham Act as a vehicle for enforcing the requirements of the FDCA. As stated by the Third Circuit in *Sandoz Pharmaceuticals v. Richardson–Vicks, Inc.,* 902 F.2d 222 (3d Cir. 1990), "what the FD & C Act ... [does] not create directly, the Lanham Act does not create indirectly[.]" *Id.* at 231. A Lanham Act cause of action cannot stand if it alleges that a defendant has failed to disclose the *fact* of FDA non-approval, when the FDA has not yet determined whether or not the product in question has been approved. Simply put, the Lanham Act does not allow a federal court to "determine preemptively how a federal agency will interpret and enforce its own regulations." *Id.*[4]

4. While this reasoning is strong as to all Defendants, it is strongest with regard to Plaintiff's allegations against York. Plaintiff asserts that York has failed to disclose that he is offering the services of a "custom" modified Summit system. The actual term "custom" is a term-of-art, defined by 21 U.S.C. § 360j(b) and 21 C.F.R. §§ 812.2 & 812.3. Clearly, it is within the FDA's domain to determine whether York's system is a "custom" device. For this Court to determine whether York has failed to disclose that he offers the services of a "custom" device, this Court would be forced to determine whether York is offering a "custom" device. Because the FDA has the statutory responsibility for interpreting the FDCA (in the first instance), the Court simply will not tread into this area.

The one case cited by Plaintiff, *Grove Fresh Distributors, Inc. v. The Flavor Fresh Foods, Inc.*, 720 F.Supp. 714, 715 (N.D.Ill. 1989), does not assist Plaintiff's position. In fact, *Grove Fresh* only reinforces this Court's interpretation and adoption of the *Mylan/Sandoz* rule. In *Grove Fresh*, the defendants sold orange juice labelled as "100% Orange Juice from Concentrate[.]" Plaintiff sued under § 43(a) of the Lanham Act, asserting that because defendants' product was not 100% orange juice, its labelling was false and misleading. The defendants argued that the Lanham Act claim restated an FDCA claim because FDA regulations provided the definition of 100% pure orange juice. Nevertheless, the district court found that the claim was not an FDCA cause of action because, even without the FDA's orange juice definition, plaintiff could still establish a violation of § 43(a)—indeed, the commercial definition of pure orange juice could be determined without *any* reference to FDA regulations.

Furthermore, *Grove Fresh* involved the affirmative misrepresentation of a fact—the actual ingredients of the juice. Clearly, under both *Mylan* and *Grove Fresh*, a plaintiff may bring a Lanham Act cause of action for affirmatively misrepresenting facts, even if the truth of those facts may be governed by FDA regulations. *See also Pfizer, Inc. v. Miles, Inc.*, 868 F.Supp. 437, 449 (D.Conn. 1994) (literally false statements concerning areas of the FDA's purview can be actionable under the Lanham Act). By contrast, this case involves the failure to disclose a "fact," the truth of which is *currently* being reviewed and determined by the FDA.

Therefore, because Plaintiff's Lanham Act action would essentially act as a private vehicle for enforcing FDCA and FDA regulations, it must be dismissed as to all Defendants.[5]

**2. Plaintiff's Second and Third Causes of Action Against Hi–Line Under 15 U.S.C. §§ 1114 & 1124**

In its second and third causes of action, Plaintiff asserts that Hi–Line has violated

Summit's trademark rights by importing goods bearing infringing marks or names, thus infringing Summit's registered trademark. Because the second and third causes of action both turn on whether the allegedly infringing goods are "genuine" and whether the "first sale" doctrine applies, the Court will address both claims together.

■ An action for trademark infringement under § 32 of the Lanham Act (15 U.S.C. § 1114) arises when "[a]ny person . . . without the consent of the registrant . . . use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods . . . in connection with such use [which] is likely to cause confusion." § 1114(1)(a). The "touchstone" of liability under § 32 is, of course, the "likelihood of confusion as to the source of the goods." *John Paul Mitchell Systems v. Pete–N–Larry's Inc.*, 862 F.Supp. 1020, 1023 (W.D.N.Y. 1994). Accordingly, "[a]n action will not arise where the goods being sold are genuine goods bearing a true mark." *Polymer Technology Corp. v. Mimran*, 37 F.3d 74, 78 (2d Cir.1994). Additionally, "[t]rademark law generally does not reach the sale of genuine goods bearing a true mark even though such sale is without the mark owner's consent." *NEC Electronics v. CAL Circuit Abco*, 810 F.2d 1506, 1509 (9th Cir.), *cert. denied*, 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 108 (1987). "Once a trademark owner sells his product, the buyer ordinarily may resell the product under the original mark without incurring any trademark liability." *Id.* at 1509; *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1074 (9th Cir.), *cert. denied*, — U.S. —, 116 S.Ct. 302, 133 L.Ed.2d 207 (1995) ("Resale by the first purchaser of the original article under the producer's trademark is neither trademark infringement nor unfair competition."); *Matrix Essentials v. Emporium Drug Mart*, 988 F.2d 587, 590 (5th Cir.1993) (stating the same principle).

---

**5.** This dismissal is without prejudice, however, to Plaintiff's ability to amend by adding § 43(a) allegations which do not operate as a vehicle for enforcing the FDCA.

Section 42 of the Lanham Act (15 U.S.C. § 1124) bars the import into the United States of merchandise that

> ... cop[ies] or simulate[s] the name of ... any domestic manufacture, or manufacturer ... or which shall copy or simulate a trademark registered ... or shall bear a name or mark calculated to induce the public to believe that the article is manufactured in the United States, or that it is manufactured in any foreign country or locality other than the country or locality in which it is in fact manufactured[.]

§ 1124. This section "undeniably bespeak[s] an intention to protect domestic trademark holders from foreign competitors who seek a free ride on the goodwill of domestic trademarks." *Lever Bros. Co. v. United States,* 877 F.2d 101, 105 (D.C.Cir.1989). However, "the importation of a ... good identical to a good authorized for sale in the domestic market does not violate section 42," so long as the identical good is sold under the identical mark. *Societe Des Produits Nestle v. Casa Helvetia,* 982 F.2d 633, 639 (1st Cir.1992). Accordingly, under both sections 32 and 42, the analysis turns on whether the allegedly infringing goods are genuine or "differ materially" from the plaintiff's goods. *Id.* at 638–39.

In this case, Summit alleges that, over the last decade, it has developed its Excimer Laser Systems and sold them in foreign countries. Summit further alleges that Hi–Line has acquired used Summit systems in foreign countries and then re-imported them into the United States for sale. Summit does not allege that Hi–Line has altered the systems in any way. Indeed, Summit does not assert that the re-imported systems are not "Summit" products.

Regardless, Summit alleges that the re-imported used systems are not genuine Summit products because they "differ materially" from Excimer Laser Systems intended for domestic use. *Nestle,* 982 F.2d 633 at 638. Summit asserts that unlike the Excimer Laser Systems authorized for domestic distribution, the re-imported used systems are not approved by the FDA, are materially different in other respects, and are not subject to the same Summit quality controls as the domestic systems. In addition, Summit asserts that consumers will be misled into believing that Summit authorizes the sale and use of these re-imported goods in the United States. Hi–Line responds that because Summit actually manufactured *and* initially sold the re-imported used systems, they are indeed "genuine" Summit products. Hi–Line further argues that because the used systems are genuine, and Summit did not restrict the rights of the foreign buyers, the section 32 and 42 claims are barred by the so-called "first sale" doctrine, as stated in *NEC* and *Sebastian.*

At first glance, this appears to be a rather simple issue. Indeed, if the facts alleged all occurred within the United States, this would be an extremely easy case. Under the "first sale" doctrine, Summit simply could not prevent its used products (distributed subsequent to Summit's "first sale") from competing with its new products. What makes this issue more complex, however, is that Summit products intended, approved, and sold for *foreign* use have been injected into the *domestic* market and are now in competition with new Summit laser systems. Summit asserts that because the used foreign Summit products are "materially different" from the Summit products approved by the FDA and authorized by Summit for domestic distribution, the "first sale" rule cannot apply. Therefore, any importation of such products or their subsequent distribution in the United States constitutes trademark infringement.

The Court does not agree. The essential fact remains that, based on the allegations in the Complaint, the re-imported laser systems are *Summit* products, manufactured and sold by Summit itself. Compl. ¶ 24; Plaintiff's Opposition at 3 & 6. Thus, consumers will not be confused as to whether the re-imported laser systems are "Summit" systems—they are. There is no "likelihood of confusion as to the source of the goods," which, based on Plaintiff's allegations, is Summit. *John Paul Mitchell,* 862 F.Supp. at 1023. Therefore, regardless of the international dimension of this case, the Ninth Circuit's rulings in *NEC* and *Sebastian* apply to bar Plaintiff's claims. As stated by the Ninth

Circuit, "the right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product." *Sebastian*, 53 F.3d at 1074. Under *Sebastian*, Summit simply cannot use trademark law to control the downstream distribution of products that Summit *itself* manufactured and sold. The mere fact that Summit sold its goods abroad rather than domestically does not create an exception to the "first sale" doctrine.

Moreover, the fact that Summit sold *different* goods in different markets for different prices does not render the "first sale" rule inapplicable. As discussed by the Ninth Circuit in *NEC*, if Summit chooses to price its goods differently, or manufacture different goods for different countries, it cannot look to the Lanham Act to protect its domestic market. *NEC*, 810 F.2d at 1511. Simply put, if Summit manufactures laser systems which differ from those designed for use in the United States, and sells them in foreign markets, Summit does so at its own risk. If Summit desires to protect its U.S. systems from competition from used Summit models originally intended for foreign use, Summit must look to other sources of protection, such as exclusive licensing or restrictive distribution agreements. Under the "first sale" doctrine, Summit clearly cannot look to trademark law for support.

■ Summit's reliance on *Nestle, Original Appalachian Artworks v. Granada Electronics*, 816 F.2d 68 (2d Cir.), *cert. denied*, 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987) and other "gray market" goods cases is misplaced. As discussed by the Third Circuit, "[t]he term 'gray-market goods' refers to foreign manufactured goods, for which a valid United States trademark has been registered, that are legally purchased abroad and imported into the United States without the consent of the American trademark holder." *Weil Ceramics & Glass, Inc. v. Dash*, 878 F.2d 659, 662 n. 1 (3d Cir.), *cert. denied*, 493 U.S. 853, 110 S.Ct. 156, 107 L.Ed.2d 114 (1989).[6] For example, *Nestle*

involved chocolates distributed under the American trademark "Perugina" (owned by Nestle), manufactured by a Nestle licensee in Venezuela, and then imported into the United States. *See also Lever*, 877 F.2d 101 (U.S. manufacturer sues to force Customs Service to exclude goods made by related U.K. manufacturer under the same trademark); *Original Appalachian*, 816 F.2d 68 (U.S. trademark owner sued for injunction against distribution of foreign manufactured "Cabbage Patch" dolls).

Often, the problem in a "gray market" situation is that "goods bearing identical trademarks are sold at different prices in two different geographical regions. Because of the price difference, there are incentives for an arbitrageur to buy goods in the market with the lower price and resell those goods in other markets at higher prices." Shubba Ghosh, *An Economic Analysis of the Common Control Exception to Gray Market Exclusion*," 15 U.Pa.J.Int'l Bus.L. 373 (1994) (Westlaw page reference *2). In addition, although the "gray market" imports bear the same mark, they may be of lesser quality than the domestic products. Accordingly, they may disappoint consumers who are deceived into believing that the "gray market" products are the domestic articles, adversely affecting the U.S. trademark holder's goodwill. Therefore, because trademark law protects both the "producer's investment in goodwill and product quality and the consumer's interest in reducing search costs and being assured of product quality," (*see* Ghosh, *49) courts have generally held that "gray market" goods infringe trademark rights if they "differ materially" from similar domestic goods sold under the same mark. *See also* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 29.19[4] ("if there are material differences between the gray market imports and the authorized imports, then the gray market imports are not 'genuine' imports and can create a likelihood of confusion."). Thus, in *Nestle*, the First Circuit found infringement because the Venezuelan manufactured choco-

---

6. As discussed by the Supreme Court in *K mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 286, 108 S.Ct. 1811, 1815, 100 L.Ed.2d 313 (1988), such a "gray market" situation can occur in a variety of contexts. However, in each case, the allegedly infringing goods are *manufactured* abroad, sold under the mark of the U.S. trademark holder, and then imported into United States.

lates differed materially from the "Perugina" chocolates manufactured in Italy and authorized for the U.S. market. Similarly, in *Original Appalachian,* the Second Circuit found infringement when Spanish made "Cabbage Patch" dolls were imported into the United States and differed materially from their U.S. made counterparts.

But this is *not* a "gray market" goods case. Unlike the typical "gray market" situation, all the "Summit" products at issue are manufactured and distributed by Summit itself. The new and used Summit products are thus not "parallel" products—they are all "genuine" Summit-made products. Accordingly, there is no danger that consumers are likely to be confused as to the *source* of the Summit laser systems—the main concern of trademark law. On the face of the Complaint, Summit admits that all of the laser systems in question are manufactured and distributed by Summit *itself,* not by any foreign manufacturer. Although the various laser systems may have "material" differences, they are all genuine Summit manufactured products—none are "gray market" goods.

Accordingly, the "gray market" analysis applied in *Nestle, Original Appalachian,* and *Lever* does not apply in this case. Nor should it. Underlying the "gray market"

cases is the concern that consumers will be deceived by lesser quality goods manufactured by foreign licensees of the U.S. trademark holder. In most of these cases, the U.S. trademark holder does not have direct control over the manufacture or initial distribution of the goods in question. Rather, the U.S. trademark holder is subjected to competition from imported goods made and initially distributed by a foreign affiliated corporation with a foreign trademark (as in *Lever*), or initially made and distributed in a foreign market by a foreign licensee (as in *Nestle*). The U.S. trademark holder has no direct control over the manufacture, quality, or initial distribution of the products.

By contrast, in this case, Summit has direct control over the quality, contents, manufacture, and initial distribution of all of the laser systems at issue. The U.S. trademark holder, Summit, has chosen to sell systems abroad that may differ from those designed for the U.S. market. However, these "foreign" models are "genuine" Summit goods, manufactured and initially distributed under Summit quality control standards.[7] The fact that used Summit systems are now in competition with new systems intended for U.S. use is not a matter of trademark law concern. Certainly, Summit might have dealt with this problem by drafting restrictive licensing

---

7. This fact alone distinguishes this case from *Shell Oil Co. v. Commercial Petroleum, Inc.,* 928 F.2d 104 (4th Cir.1991), *El Greco Leather Products Co., Inc. v. Shoe World,* 806 F.2d 392 (2d Cir.1986), *cert. denied,* 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987), and *Adolph Coors Co. v. A. Genderson & Sons, Inc.,* 486 F.Supp. 131 (D.Colo.1980). In these cases, the plaintiffs sued distributors or licensees who purported to sell new goods, but had failed to maintain them to the trademark holder's quality standards, so that they were no longer "genuine" goods of the trademark holder. In *Shell,* the defendant was a wholesale seller of bulk Shell oil to retailers. Because the defendant did not employ Shell quality control standards, the Fourth Circuit found that the oil distributed by defendant was not "genuine" Shell oil. In *El Greco,* the plaintiff trademark holder had terminated the licensed manufacturer of its line of shoes. After this termination, the manufacturer sold its excess shoes (which had not been inspected by the plaintiff pursuant to the contract) to defendant, who then sold the shoes to consumers. Because these goods had not been inspected pursuant to the trademark holder's standards, the court found the defendant's shoes not to be genuine.

Finally, in *Coors,* the defendant distributor failed to maintain or refrigerate the "Coors" beer before selling it to consumers. As in *Shell,* this failure to meet the trademark holder's quality standards rendered the products not genuine.

By contrast, in this case, Summit controls the entire manufacturing, quality, and initial distribution process. When Summit's systems first enter the marketplace, Summit is assured that the machines are manufactured under Summit quality control standards. However, after the first sale, Summit cannot claim that subsequent sales without sufficient quality controls render the systems non-genuine. In its Complaint, Summit admits that all the systems at issue are *used* products. None of the defendants represent them to be new. Absent contractual agreement, Summit cannot mandate that subsequent consumers and owners of the laser systems meet Summit quality control standards. Therefore, *Shell, El Greco,* and *Coors* are inapposite to this case. *See also Matrix,* 988 F.2d at 591 (distinguishing *Shell, El Greco,* and *Coors* because in those cases the quality control defect affected the quality of the product *itself,* before it reached unwary consumers).

agreements or barring foreign purchasers from re-importing the Summit machines into the United States. Summit apparently failed to do this. It cannot now turn to trademark law to remedy this failure.

Thus, for all the reasons discussed above, Summit's second and third causes of action for trademark law violations must be dismissed. It is quite clear that "[r]esale by the first purchaser of the original article under the producer's trademark is neither trademark infringement nor unfair competition." *Sebastian*, 53 F.3d at 1074. Under this "first sale" doctrine, Summit simply cannot control the downstream distribution of products it originally sold in foreign markets. Because Summit's trademark claims against Hi–Line attempt to do this, they must be dismissed.[8]

### 3. Summit's Third Cause of Action Under 15 U.S.C. § 1114 Against York

The parties do not indicate how the "first sale" analysis would be different as to York, and the Court does not perceive a difference. Therefore, Plaintiff's third cause of action for trademark infringement against York must also be dismissed.

### 4. Summit's Fourth Cause of Action for Copyright Infringement Against Hi–Line

In its fourth cause of action, Plaintiff alleges that Hi–Line has infringed Summit's copyright by re-importing the computer software accompanying the laser systems for distribution in the United States. Hi–Line asserts that this claim also must be dismissed under the "first sale" rule.

This issue is complicated by several seemingly contradictory provisions of the Copyright Act. Under 17 U.S.C. § 106(3), a copyright owner has the exclusive right to "distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending[.]" However, the distribution right is not absolute. It must give way "where the copyright owner first consents to the sale or other distribution of copies or phonorecords of his work." Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.12[A]. Accordingly, under 17 U.S.C. § 109(a), "the owner of a particular copy or phonorecord lawfully made ... is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord." Section 109(a) is the copyright law's expression of the "first sale" doctrine. In essence, "a sale of a 'lawfully made' copy terminates the copyright holder's authority to interfere with subsequent sales or distribution of that particular copy." *Parfums Givenchy, Inc. v. Drug Emporium, Inc.*, 38 F.3d 477, 480 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1315, 131 L.Ed.2d 197 (1995). "[A]t that point, the policy favoring a copyright monopoly for authors gives way to policies disfavoring restraints of trade and limitations on the alienation of personal property[.]" *Parfums Givenchy, Inc. v. C & C Beauty Sales, Inc.*, 832 F.Supp. 1378, 1388 (C.D.Cal.1993); *see also Sebastian Int'l, Inc. v. Consumer Contacts (PTY) Ltd.*, 847 F.2d 1093, 1096 (3d Cir.1988) (the first sale rule "finds its origins in the common law aversion to limiting the alienation of personal property.").

Co-existing with §§ 106(3) & 109(a) is 17 U.S.C. § 602(a). Under § 602(a), "[i]mportation into the United States, without the authority of the owner of copyright ... of copies or phonorecords of a work that have been acquired outside the United States is an infringement of the exclusive right to distribute copies or phonorecords under section 106." This section was enacted as part of the 1976 Copyright Act "in response to concerns

---

8. Summit also argues that the used re-imported lasers are not genuine because they have not been subsequently maintained or serviced by trained Summit personnel. This argument stretches the Lanham Act far beyond its intended bounds. Taking the argument to its logical conclusion, this would mean that any person who sells a used unmaintained product could be liable for trademark infringement. Certainly, sales of used unserviced goods can dilute the goodwill of the original trademark holder, at least in the eyes of undiscerning consumers. But as stated in *Sebastian*, the countervailing concern is the desire to "preserve[ ] an area for competition" in the marketplace. *Sebastian*, 53 F.3d at 1075. This is the intent of the "first sale" doctrine. Accordingly, Plaintiff's argument is meritless.

expressed by representatives of the printing and recording industries that ... unauthorized importation infringed the rights of United States copyright owners." *C & C Beauty Sales*, 832 F.Supp. at 1390. Section 602(a) addressed these concerns by making "the mere act of importation—regardless of sale—an infringement of Section 106(3)'s distribution right, and prohibits unauthorized importation, not only of pirated copies, but also of copies that were lawfully made." *Id.* (citing H.R.Rep. No. 1476, at 169–70, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5785–86). Essentially, the section "ensures that a U.S. copyright owner will gain the full value of each copy sold in the United States, by preventing the unauthorized importation of copies sold abroad from being used as a means of circumventing the copyright owner's distribution rights in the United States." *Parfums*, 38 F.3d at 481.

Harmonizing § 109(a) with § 602(a) has proven to be quite challenging. As stated in a recent law review comment, "[i]t is unclear whether § 602(a) is limited by the first sale doctrine or if it is exempt from the doctrine's limitations when goods are legitimately first sold abroad and then imported into the United States. If the doctrine does not affect a sale of goods abroad, unauthorized importations can be restricted. However, if § 109(a) remains in effect, such importations cannot be prevented." Donna K. Hintz, Comment, *Battling Gray Market Goods With Copyright Law*, 57 Albany L.Rev. 1187, 1208 (1994); *see also* Nimmer & Nimmer, *Nimmer on Copyright* § 8.12[B][6] (recognizing the possible conflict between §§ 109(a) and 602(a)); Doris R. Perl, Comment, *The Use of Copyright Law to Block the Importation of Gray–Market Goods: The Black and White of It All*, 23 Loy.L.A.L.Rev. 645, 651 (1990) ("sections 602(a) and 109(a) appear to conflict when

copyrighted goods sought to be imported have undergone a first sale.").

■ Reviewing the case law, the courts appear to be in agreement in one respect: "sales *abroad* of foreign manufactured United States copyrighted materials do not terminate the United States copyright holder's exclusive distribution rights in the United States under §§ 106 and 602(a)." *Parfums Givenchy*, 38 F.3d at 482 n. 8. *See also T.B. Harms Co. v. Jem Records, Inc.*, 655 F.Supp. 1575, 1583 (D.N.J.1987) (§ 602(a) applied in case where goods were manufactured and initially sold abroad); *Hearst Corp. v. Stark*, 639 F.Supp. 970, 977 (N.D.Cal.1986) ("section 109 does not limit the application of section 602 where defendants make wholesale importations into the United States of copyrighted materials manufactured outside the country."); *Columbia Broadcasting System, Inc. v. Scorpio Music Distributors, Inc.*, 569 F.Supp. 47 (E.D.Pa.1983), *aff'd*, 738 F.2d 421 (3d Cir.1984) (coming to the same conclusion). In other words, under § 602(a), if a U.S. copyright holder licenses other entities to manufacture and sell copies of its works outside the United States, that copyright owner can prevent these foreign manufactured and purchased works from being sold and competing in the *domestic* market.[9] Section 602(a), therefore, clearly provides protection to domestic copyright owners in the classic "gray market" goods situation: where the domestic copyright owner's copies (which are intended for domestic sale) are placed in competition with identical copies manufactured and sold abroad.[10] *See also* Nimmer & Nimmer, *Nimmer on Copyright* § 8.12[B][6] n. 104 ("it is accurate to state that the Copyright Act bars the importation of gray market goods[.]").

However, as discussed above, this is not a classic "gray market" goods case. In this

---

**9.** Of course, as pointed out in *Parfums Givenchy,* if the copyright owner consents to the importation of these goods, and then sells them in the United States, § 602(a) would not apply. *See Parfums Givenchy*, 38 F.3d at 482 n. 8.

**10.** In *Parfums Givenchy,* the Ninth Circuit held that this rule applies even in the situation where the U.S. copyright holder is the wholly-owned subsidiary of the foreign manufacturer.

*Compare K mart,* 486 U.S. at 294, 108 S.Ct. at 1819 (wholly owned subsidiary of foreign manufacturer cannot invoke § 526 of the Tariff Act to prevent third parties from competing in the domestic market by buying the foreign parent company's trademarked goods abroad and importing them into the United States); *NEC*, 810 F.2d at 1509 (wholly owned subsidiary of foreign manufacturer cannot invoke Lanham Act to prevent third party from importing parent company's product).

case, Summit's laser systems were manufactured *in* the United States by Summit, sold by Summit abroad when sales in the U.S. had not been approved by the FDA, and *then* re-imported by subsequent owners into the United States. Therefore, none of the cases cited above directly control this case. Indeed, in both *BMG Music v. Perez*, 952 F.2d 318 (9th Cir.1991), *cert. denied*, 505 U.S. 1206, 112 S.Ct. 2997, 120 L.Ed.2d 873 (1992) and *Parfums Givenchy*, the Ninth Circuit expressly declined to rule on a factual scenario similar to the instant case. *See Parfums Givenchy*, 38 F.3d at 482 n. 7; *BMG*, 952 F.2d at 319 n. 3. Only a handful of cases have addressed the situation presented in this case—where the goods are manufactured in the United States by the copyright holder, sold abroad, and then re-imported into the United States. In the Third Circuit's *Sebastian* case, the plaintiff was a California corporation which manufactured beauty supplies in the United States. It held copyrights in the text and artistic content contained on the product's labels. The plaintiff sold the supplies to the defendant, who agreed to distribute the products exclusively in South Africa. After sending some of the products to South Africa, the defendant then re-shipped the products back into the United States for distribution domestically. The plaintiff sued and obtained a preliminary injunction. The district court had held that under § 602(a), the "copyright holder has a right to control importation of copies, regardless of where they were made and despite the occurrence of a 'first sale.'" *Sebastian*, 847 F.2d at 1095 (citing *Sebastian Int'l, Inc. v. Consumer Contact (PTY) Ltd.*, 664 F.Supp. 909, 920 (D.N.J.1987)).

The Third Circuit reversed. The court recognized that "[a]t first glance, section 602(a)—the importation clause—appears to clash with the first sale doctrine." *Sebastian*, 847 F.2d at 1097. However, the court concluded that "the two provisions were intended to function interdependently and may be read in harmony with each other." *Id.* The court interpreted § 602(a) as stating that unauthorized importation was "an infringement of 'the exclusive [section 106(3)] right to distribute copies.'" *Id.* at 1099. Section 602(a) "does not purport to create a right in addition to those conferred by section 106(3)[.]" *Id.* "Because that exclusive right is specifically limited by the first sale provisions of § 109(a), it necessarily follows that once transfer of ownership has cancelled the distribution right to copy, the right does not survive so as to be infringed by importation." *Id.* In other words, once the distribution right terminates, so does the importation right.

Thus, because the plaintiff itself had *produced* and *sold* the exact same products that it later sought to control, and therefore had received a "reward" for its work, the "first sale" rule of § 109(a) applied. The court distinguished other § 602(a) cases in which the U.S. copyright holder had not actually produced the works in question; rather, in those cases, the imported copies had been produced and initially sold by foreign affiliates or licensees. Accordingly, the copyright owner had never actually "owned" the tangible copies that were "first sold." Therefore, sales by the manufacturer-licensee did not transfer "ownership" from the copyright owner, and thus terminate its distribution or importation right. But in *Sebastian*, the plaintiff *had* received a "reward," because *it* had actually manufactured the product and made the first sale. Accordingly, the Third Circuit held that regardless of the *place* of sale, "a first sale *by the copyright owner* extinguishes any right later to control importation of those copies." *Id.* (emphasis added).[11]

---

11. Two other cases have addressed this issue in the context of goods manufactured in the United States by the copyright owner: *Neutrogena Corp. v. U.S. Secretary of the Treasury*, 1988 WL 166236 (D.S.C. April 5, 1988) and *Cosmair, Inc. v. Dynamite Enterprises, Inc.*, 1985 WL 2209 (S.D.Fla. April 5, 1985). In both cases, the courts found that the first sale doctrine applied, and that § 602(a) was inapplicable. However, both of these cases focused on the *place* of manufacture and sale, rather than on the question of whether the copyright owner actually cancelled its distribution right by selling a tangible copy that it, in fact, owned. As pointed out in *Sebastian*, such an interpretation of § 109(a) and § 602(a) is tenuous because nothing in the language of these provisions focuses on the place of manufacture. *See Sebastian*, 847 F.2d at 1098 n. 1.

In the recent unpublished case of *L'Anza Research Int'l v. Quality King, et al.,* CV 94–0841 JSL, another court in the Central District of California reached the contrary conclusion.[12] Disagreeing with the *Sebastian* decision, the *L'Anza* court focused on the place of first sale, stating that "[t]he initial placement of the copy in a certain market should determine where the product is 'sold' or 'acquired' for purposes of § 602(a)." *L'Anza* at p. 7.[13] Thus, if a U.S. copyright holder manufactures a product, and then itself sells the product abroad, § 109(a)'s "first sale" rule will not provide a defense to a subsequent importer. Stated another way, under *L'Anza*, § 109(a) applies to terminate the importation right only as to goods sold initially in the United States, and *not* abroad.[14]

■ In light of the competing policies involved, as well as the language of the statutory provisions, the Court finds the Third Circuit's reasoning in *Sebastian* persuasive. The Court agrees with the Third Circuit that the place of sale cannot be "the critical factor in determining whether section 602(a) governs." *Sebastian*, 847 F.2d at 1099. Indeed, if the place of sale were the "critical" factor, this would entirely eviscerate § 109(a) with regard to goods first purchased outside the United States. Simply put, the "first sale" doctrine would have no application if the "first sale" of a particular copy occurred abroad. In such a situation, a copyright owner could bar the importation of lawfully obtained particular copies into the United States *indefinitely,* even if the copyright owner made the first sale itself. Such a rule would unwarrantedly limit the scope of § 109(a), and would undercut the basic policy reasons behind the "first sale" doctrine—allowing greater competition and a more

fluid economy. Furthermore, such an interpretation of § 602(a) would encourage copyright owners to create pricing systems that discriminate against U.S. consumers.

As the court noted in *Sebastian,*

... [n]othing in the wording of section 109(a), its history or philosophy, suggests that the owner of copies who sells them abroad does not receive a "reward for his work." Nor does the language of section 602(a) intimate that a copyright owner who elects to sell copies abroad should receive "a more adequate award" than those who sell domestically. That result would occur if the holder were to receive not only the purchase price, but a right to limit importation as well.

*Sebastian*, 847 F.2d at 1099. Interpreting § 602(a) to trump § 109(a) when the "first sale" occurs abroad would do just that. It would allow the copyright owner to control the distribution of a particular copy, even after selling it and "relinquish[ing] all further rights 'to sell or otherwise dispose of possession of that copy.'" *Sebastian*, 847 F.2d at 1098–99 (quoting § 109(a)). This result would nullify much of the intended scope of § 109(a).

Such a conclusion is not compelled by the plain language of § 602(a). Again, as stated in *Sebastian,*

... [s]ection 602(a) does not purport to create a right in addition to those conferred by section 106(3), but states that unauthorized importation is an infringement of "the exclusive [section 106(3)] right to distribute copies." Because that exclusive right is specifically limited by the first sale provisions of § 109(a), it necessarily follows that once transfer of ownership has cancelled the distribution right to

**12.** A copy of the *L'Anza* opinion was submitted to the Court as Plaintiff's Exhibit 11. In citing the opinion, the Court will refer to the *L'Anza* court's pagination.

**13.** Section 602(a) states that "[i]mportation into the United States ... of copies or phonorecords of a work that have been *acquired outside the United States* is an infringement of the exclusive right to distribute copies or phonorecords under section 106[.]" (emphasis added). Thus, the *L'Anza* court also disagreed with *Sebastian*'s

characterization of § 602(a) as merely part of § 106(3)'s distribution right (as limited by § 109(a)). In other words, the *L'Anza* court interpreted § 602(a) as a right existing independent of the § 106(3) distribution right.

**14.** *L'Anza* is factually distinguishable from this case because L'Anza and its foreign distributors had a distribution agreement barring the importation of L'Anza's products into the United States.

a copy, the right does not survive so as to be infringed by importation. *Sebastian,* 847 F.2d at 1099. By selling its software abroad, Summit transferred ownership of its copies of the software, and thus "cancelled [its] distribution right" to those copies. *Id.* By the plain language of the statute, § 602(a) does not operate to resurrect distribution rights that have already been terminated by a first sale. This is simply not what the statute says. Rather, the statute states that a copyright owner's rights under § 602(a) are part and parcel of the owner's "exclusive right to distribute copies[.]" § 602(a). Accordingly, it follows that once the copyright owner's distribution right terminates, the copyright owner's right under § 602(a) must also terminate as well.

As stated above, Summit manufactured its software, owned the individual copies of the software, and then sold the copies abroad itself.[15] Summit made the "first sale," and therefore received its "reward" for its work.[16] As a result of this "first sale," Summit "cancelled [its] distribution right" under § 109(a). *Sebastian,* 847 F.2d at 1099. In other words, under § 109(a), Summit's foreign sales of software copies "extinguishe[d] any right later to control importation of those copies" under § 602(a). *Id.* Accordingly, Summit's cause of action against Hi–Line for copyright infringement must be dismissed.

### 5. Summit's Fifth Cause of Action for Copyright Infringement Against York and Ellis

 In its fifth cause of action, Plaintiff asserts that Defendants York and Ellis infringe Summit's copyright because every time York and Ellis turn on their excimer laser systems, a copy of Summit's compila-

tion of default values (the "Compilation") is created and loaded onto the Random Access Memory ("RAM") chip located in their laser systems.

Under 17 U.S.C. § 117, "it is not an infringement [of section 106's distribution right] for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided ... that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine[.]" Summit apparently concedes that § 117 would permit rightful owners of the Summit software to make "essential" copies on their RAM chips. However, Summit contends that because York and Ellis are not rightful owners of their software, they cannot make copies under § 117. Complaint ¶ 92.

The Complaint does not explicitly state why Ellis and York are not the "rightful" owners of their software. Presumably, Summit asserts that York and Ellis are not "rightful" owners because they purchased laser systems that had originally been sold abroad, and had then been imported into the United States. However, in light of the Court's resolution of the § 602(a) importation issue (see above), this argument clearly cannot stand. Under § 109(a), Summit cannot use § 602(a) to control the downstream distribution or use of tangible copies that Summit itself sold abroad. Because York and Ellis are subsequent purchasers of Summit software which Summit legally sold abroad, York and Ellis are "owners" within the meaning of § 117. Therefore, York and Ellis may copy their software, so long as it is an "essential step in the utilization of the computer program[.]" § 117. Because Plain-

---

15. This fact distinguishes this case from both *BMG* and *Parfums Givenchy.* In those cases, the U.S. copyright owner did not make the "first sale." Accordingly, while the plaintiffs in those cases had sold their intellectual property (in exchange for a license fee), the plaintiffs had never actually owned the copies that were first sold abroad. *See Sebastian,* 847 F.2d at 1099 n. 3 (noting that when a licensee manufactures a copy, the copyright owner does not own that tangible copy). Accordingly, the plaintiffs in *BMG* and *Parfums Givenchy* never transferred any ownership interest in those particular copies. Because the plaintiffs in *BMG* and *Parfums Giv-*

*enchy* never transferred any ownership interest in the particular copies, they never "cancelled" their distribution rights under §§ 106(3) & 109(a). Therefore, the plaintiffs in *BMG* and *Parfums Givenchy* could still use § 602(a) to bar imports.

16. Indeed, because the FDA had not yet approved the excimer laser systems for domestic use, Summit's sale of the software abroad provided it with the *only* "reward" available at the time.

# 316

tiff's Complaint admits that copying software onto a RAM chip is such an "essential step," Plaintiff's fifth cause of action against York and Ellis must be dismissed.

### 6. Summit's State Law Claims

### a. Summit's Sixth, Seventh, and Eight Causes of Action for Unfair Competition and False or Misleading Statements

Plaintiff also brings several related state law causes of action. The sixth cause of action is for unfair competition in violation of Cal.Bus. & Prof.Code § 17200. The "unfair" acts include violations of Cal.Health & Safety Code §§ 26000–26851 (an analogue of the federal FDCA), Cal.Bus. & Prof.Code § 2234 (mandating the Division of Medical Quality to take action against unprofessional medical conduct), the federal Lanham Act, and the federal Copyright Act. In addition, Summit asserts that Defendants have "defrauded customers by failing to make full and honest disclosures concerning the Summit products they possess and are promoting." Complaint ¶ 99. Summit also asserts that Defendants have made false and misleading statements in violation of Cal.Bus. & Prof.Code § 17500. The seventh cause of action is a common law restatement of the sixth cause of action. The eighth cause of action is a direct claim under § 17500 for false and misleading statements.

■ Under Cal.Bus. & Prof.Code § 17200, "[u]nfair competition is defined to include 'unlawful, unfair, or fraudulent business practice and unfair, deceptive, untrue or misleading advertising.'" *People v. McKale,* 25 Cal.3d 626, 631–32, 159 Cal.Rptr. 811, 602 P.2d 731 (1979). "Unfair competition" is "broadly" defined to include "anything that can properly be called a business practice and that at the same time is forbidden by

law." *McKale,* 25 Cal.3d at 632, 159 Cal. Rptr. 811, 602 P.2d 731 (quoting *Barquis v. Merchants Collection Assn. of Oakland, Inc.,* 7 Cal.3d 94, 113, 101 Cal.Rptr. 745, 496 P.2d 817 (1972)). In light of the Court's discussion above, none of the theories of "unfair competition" asserted by Plaintiff are "forbidden by law." First, the Court has dismissed Plaintiff's copyright and Lanham Act causes of action. Therefore, any California unfair competition cause of action expressly founded on violations of the Lanham or Copyright Acts cannot stand. Second, the false and misleading advertising allegation is identical to the false and misleading advertising claim dismissed above as an attempt to state a private cause of action under the federal FDCA.[17] Plaintiff has not pled any additional theories of false advertising. Lastly, to the extent that the "unfair" conduct constitutes violations of the California Food, Drug, and Cosmetic Act or Cal.Bus. & Prof.Code § 2234, the unfair competition claim must be dismissed as an attempt to assert a private right of action where none exists.[18] Aside from those theories, Plaintiff has not alleged any further unlawful conduct on the part of Defendants. Therefore, Plaintiff's sixth cause of action under Cal.Bus. & Prof.Code § 17200 must be dismissed.[19]

The Court does not see how Plaintiff's seventh and eighth causes of action are different in substance from the sixth cause of action. In Plaintiff's seventh cause of action, Plaintiff does not assert any other acts of unfair competition not covered by the sixth cause of action. Therefore, it must be dismissed.[20] Similarly, Plaintiff's eighth cause of action does not allege any false and misleading representations in addition to those discussed (and dismissed) above. Therefore,

---

17. Indeed, in the state causes of action, Plaintiff repleads the same allegations made in the federal causes of action. Complaint ¶¶ 98, 107, & 112.

18. Cal.Bus. & Prof.Code § 2234 empowers the Division of Medical Quality to "take action" against medical professionals who engage in unprofessional conduct. It does not provide a private right of action. The existence of a right of action under the California FDCA will be discussed in further detail below.

19. Of course, to the extent that Plaintiff can assert other theories of unfair competition not addressed by this Order, this dismissal is without prejudice.

20. To the extent that Plaintiff can assert other theories of unfair competition, this dismissal is without prejudice.

Plaintiff's eighth cause of action must be dismissed.[21]

### b. Summit's Ninth Cause of Action for Violation of the California Food, Drug, & Cosmetic Act ("FDCA")

 Plaintiff's last cause of action is a claim under the California FDCA (Cal.Health & Safety Code §§ 26000–26851). The California FDCA is "analogous" to the federal FDCA. *See Committee on Children's Television, Inc. v. General Foods Corp.,* 35 Cal.3d 197, 210 & n. 9, 197 Cal.Rptr. 783, 673 P.2d 660 (1983). Like its federal counterpart, the California FDCA "does not expressly provide for private enforcement." *Id.* at 210, 197 Cal.Rptr. 783, 673 P.2d 660. Rather, in another parallel to the federal FDCA, the state Department of Health is empowered to "administer and enforce the provisions" of the California FDCA. Cal.Health & Safety Code § 26200.

 No California case has directly interpreted § 26200 or specifically addressed the issue of whether a private right of action exists to enforce the California FDCA.[22] As a general rule, when a statute does not explicitly provide a private right of action, the California courts will imply such a right only in rare circumstances. Ultimately, the issue is one of divining legislative intent: whether the legislature actually intended to create such a private right of action to enforce a statute. *See Moradi–Shalal v. Fireman's Fund Ins.,* 46 Cal.3d 287, 250 Cal.Rptr. 116, 758 P.2d 58 (1988) (inquiring into the language of the statute, the legislative history, and the existence of a comprehensive administrative scheme to determine whether the legislature intended a private right of action to exist to enforce Cal.Ins.Code § 790.03); *Arriaga v. Loma Linda University,* 10 Cal. App.4th 1556, 13 Cal.Rptr.2d 619 (1992) (performing the same analysis with regard to Cal.Govt.Code § 11135).

In this case, the statute itself provides only that the Department of Health shall "administer and enforce" the provisions of the California FDCA. Cal.Health & Safety Code § 26200. The statute does not explicitly provide for a private right of action. In addition, no private right of action exists to enforce the "analogous" federal FDCA. *See Committee on Children's Television,* 35 Cal.3d at 210 n. 9, 197 Cal.Rptr. 783, 673 P.2d 660 ("Federal courts ... have refused to permit a private action under the federal Food, Drug, and Cosmetic Act ... the analogous federal statute."). Both the federal and California FDCA statutes are comprehensive public health schemes administered by expert agencies. The Court finds no expressed legislative intent to allow private litigants to enforce the California FDCA concurrently with the Department of Health. Accordingly, the Court concludes that no private right of action exists to enforce the California FDCA. Therefore, Plaintiff's ninth cause of action must be dismissed.

### IV. Conclusion

For all of these reasons, the Court hereby ORDERS that Defendants' motions to dismiss are GRANTED.

**SO ORDERED.**

---

**21.** Again, to the extent that further false and misleading statements can be alleged, this dismissal is without prejudice.

**22.** A federal court interpreting state law is bound by the decisions of the highest state court. *Hewitt v. Joyner,* 940 F.2d 1561, 1565 (9th Cir.1991), *cert. denied,* 502 U.S. 1073, 112 S.Ct. 969, 117 L.Ed.2d 134 (1992). When the state supreme court has not spoken on an issue presented to a federal court, the federal court must determine what result the state supreme court would reach based on state appellate court decisions, statutes, and treatises. *Vernon v. City of Los Angeles,* 27 F.3d 1385, 1391 (9th Cir.), *cert. denied,* — U.S. ——, 115 S.Ct. 510, 130 L.Ed.2d 417 (1994).