**PARFUMS GIVENCHY, INC.,**
Plaintiff–Appellee,

v.

**DRUG EMPORIUM, INC.,**
Defendant–Appellant.

Nos. 92–56359, 93–55050.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 3, 1994.

Decided Oct. 21, 1994.

John Borgo and R. Lawrence Bonner, Greer, Homer & Bonner, Miami, FL, for defendant-appellant.

Curtis A. Bradley, Covington & Burling, Washington, DC, for plaintiff-appellee.

Stephen Kurzman, Nixon, Hargrave, Devans & Doyle, Washington, DC, for American Free Trade Ass'n, as amicus curiae.

Diane Heiman, Bethesda, MD, for Nat. Consumers League, as amicus curiae.

Before: TANG, PREGERSON and NOONAN, Circuit Judges.

PREGERSON, Circuit Judge:

## I. INTRODUCTION

Drug Emporium, Inc. appeals a permanent injunction granted by the district court on summary judgment in Parfums Givenchy, Inc.'s ("Givenchy USA's") action for copyright infringement under 17 U.S.C. § 602(a). Givenchy USA owns the United States copyright to the box design of Amarige perfume. Givenchy USA brought the instant action after its representatives purchased a bottle of Amarige perfume, in the original copyrighted packaging, from a discount retail store owned by Drug Emporium. The permanent injunction restrains Drug Emporium from continuing to sell or market the copyrighted Amarige box design in the United States. We have jurisdiction over the appeal under 28 U.S.C. § 1291. We affirm.

## II. FACTS

The facts are not in dispute. This case concerns the importation and sale of Amarige, a perfume that is produced in France by Parfums Givenchy, S.A. ("Givenchy France"). Amarige is marketed in distinctively decorated individual boxes designed by employees of Givenchy France. Givenchy France began importing Amarige to the United States in early 1992, and shortly thereafter sold its United States copyright interests in the Amarige box design to appellee, Givenchy USA, its wholly owned subsidiary. Givenchy USA then recorded the box design with the United States Copyright office, obtained a valid registration certificate, and began a multi-million dollar national advertising campaign to promote the perfume.

Meanwhile, third parties purchased or otherwise lawfully obtained quantities of Amarige abroad. The Amarige was packaged in the original distinctively designed box. The third parties then imported the Amarige into the United States without the authorization of either Givenchy France or Givenchy USA. Some or all of the Amarige was imported into the United States before Givenchy France assigned its U.S. copyright interests in the Amarige box design to Givenchy USA. Drug Emporium, a nationwide retail chain, purchased the Amarige from the importing third parties in the United States, and began marketing the perfume in the United States in its original copyrighted packaging. Drug Emporium made all of its purchases of Amarige *after* Givenchy USA became the registered U.S. copyright owner of the box design.

## III. DISCUSSION

We review a grant of summary judgment de novo. *Smith v. Noonan,* 992 F.2d 987, 989 (9th Cir.1993). We must determine whether, viewing the evidence in the light most favorable to the non-moving party, there are any genuine issues of material fact, and whether the district court correctly applied the relevant substantive law. *Botefur v. City of Eagle Point,* 7 F.3d 152, 154 (9th Cir.1993).

Drug Emporium raises two primary issues on appeal: (1) It challenges the district court's determination that Givenchy USA had standing to sue for the alleged copyright infringements; and (2) It challenges the district court's determination that the "first sale" doctrine does not apply to shield Drug Emporium from liability for copyright infringement.

### A. Standing:

Section 501 of the Copyright Revision Act of 1976, Pub.L. 94–553, 17 U.S.C. §§ 101–914 (the "Copyright Act") provides that "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement . . . committed *while he or she is the owner* of it." 17 U.S.C. § 501(b). The dis-

trict court found that Givenchy USA had standing to sue under the Copyright Act because it owned the United States copyright to the box design when the infringement occurred.[1]

■ Drug Emporium contends that there .is a genuine issue of fact whether Givenchy USA owned the copyright to the box design at the time of the alleged infringement. Drug Emporium points out that the third party wholesaler from whom it obtained its supply of Amarige purchased a large quantity of the product abroad *before* Givenchy France sold its U.S. copyright interest in Amarige to Givenchy USA. But Drug Emporium's alleged copyright infringement did not occur when the Amarige was *imported.* Rather, it occurred when Drug Emporium *attempted to distribute* the perfume that had been imported without Givenchy USA's (or Givenchy France's) authorization.[2]

It is undisputed that Givenchy USA was the United States copyright owner when Drug Emporium marketed and sold the Amarige in its copyrighted package. Therefore, Givenchy USA had standing to sue under the Copyright Act.

1. The district court additionally found that Givenchy USA had standing to sue because it was the assignee of Givenchy France. Because we find that Givenchy USA had standing based on its ownership of the copyright at the time the violation occurred, we do not address the question whether it also had standing as an assignee of Givenchy France.

2. Drug Emporium argues in its reply brief that if the alleged infringement occurred when it *distributed* Amarige, rather than when the Amarige was *imported*, then the violations necessarily arose under § 106(3) (which protects distribution of copyrighted goods), rather than under § 602(a) (which protects importation of copyrighted goods). This distinction is irrelevant to the standing question. The Copyright Act protects copyright owners against both unauthorized importation *and* subsequent unauthorized distribution of copies of copyrighted materials. *See BMG Music v. Perez*, 952 F.2d 318, 320 (9th Cir.1991) (affirming district court holding that defendant infringed plaintiffs' copyright by importing *and selling* plaintiffs' copyrighted material manufactured abroad).

3. 17 U.S.C. § 106 provides:

## B. Does the "first sale" doctrine protect Drug Emporium?

### 1. Harmonizing first sale doctrine and importation right:

■ The owner of a registered copyright has the "exclusive rights" to *authorize or distribute* copies of the copyrighted work to the public. 17 U.S.C. § 106(3).[3] However, under the "first sale" doctrine, embodied in § 109(a) of the Copyright Act, 17 U.S.C. § 109(a), a sale of a "lawfully made" copy terminates the copyright holder's authority to interfere with subsequent sales or distribution of that particular copy.[4] Section 109(a) thus provides a defense to liability under § 106(3) for lawful purchasers of copies of copyrighted materials, so long as the copies were "lawfully made under this title." Drug Emporium contends on appeal that this section protects it from § 602 liability for copyright infringement.

■ Whether Drug Emporium may rely on the first sale doctrine depends on the relationship between this doctrine and the "importation right" codified at 17 U.S.C. § 602(a). Section 602(a) provides that unauthorized *importation* of *foreign* purchased copies of U.S. copyrighted materials is an infringement of the distribution rights provided in § 106.[5] There are at least two

Subject to sections 107 through 120, the owner of [a] copyright under this title has the exclusive rights to do and to authorize any of the following:

\* \* \* \* \* \*

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership or by rental, lease or lending.

4. 17 U.S.C. § 109(a) entitled, "Limitations on exclusive rights: Effect of transfer of particular copy or phonorecord," provides:

Notwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord·lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord.

5. 17 U.S.C. § 602(a) provides that:

Importation into the United States, without the authority of the owner of copyright under this title, of copies or phonorecords of a work that have been acquired outside the United States is an infringement of the exclusive right to dis-

plausible interpretations of the interaction of the importation right and the first sale doctrine as embodied in §§ 602(a) and 109(a). Drug Emporium contends that § 109(a) supersedes § 602(a). In its view, a lawful sale *abroad* of U.S. copyrighted foreign goods would terminate the exclusive right of the U.S. copyright holder to import and distribute those goods in the United States, in the same way that a lawful domestic sale terminates the exclusive distribution rights of domestically manufactured materials. Thus, Drug Emporium argues, Givenchy USA may not interfere with the U.S. distribution of Amarige, lawfully obtained abroad, even though it owns the U.S. copyright to the Amarige box design, and even though the perfume was imported into the United States in the original box without Givenchy USA's authorization.[6] In contrast, Givenchy USA contends, and we agree, that the importation right survives as to a particular copy unless and until there has been a "first sale" *in the United States.*

■ Prior to the 1976 amendments to the Copyright Act, the unauthorized importation of non-pirated copyrighted articles was not prohibited. *See* Act of Mar. 4, 1909, ch. 320, § 30, 35 Stat. 1075, 1082 (1909). Section 602(a) was enacted in order to provide greater remedies for U.S. copyright owners, and "makes the mere act of importation—regardless of sale—an infringement of Section 106(3)'s distribution right, and prohibits unauthorized importation, not only of pirated copies, but also of copies that were lawfully made." *See Parfums Givenchy v. C & C Beauty Sales,* 832 F.Supp. 1378, 1390 (C.D.Cal.1993). As the district court in *C & C Beauty Sales* recognized, § 602(a) in effect gives § 106(3) an extraterritorial scope. *Id.* This section ensures that a U.S. copyright owner will gain the full value of each copy

sold in the United States, by preventing the unauthorized importation of copies sold abroad from being used as a means of circumventing the copyright owner's distribution rights in the United States. *Id.* at 1390–91.

We examined this precise issue in *BMG Music v. Perez,* 952 F.2d 318, 319 (9th Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2997, 120 L.Ed.2d 873 (1992). In that case the defendant was an entrepreneur who purchased copyrighted sound recordings manufactured abroad, imported them to the United States, and sold them here in retail outlets. The defendant in *BMG Music,* like Drug Emporium in this case, claimed that the first sale doctrine of § 109(a) protected him from liability even though he purchased the copyrighted recordings abroad and imported them without plaintiff copyright holder's authorization. We disagreed, holding that "[t]he words 'lawfully made under this title' in § 109(a) grant first sale protection only to copies legally made and sold in the United States." *Id.* at 319 (citing *CBS v. Scorpio Music Distributors,* 569 F.Supp. 47 (E.D.Pa.1983), *aff'd without op.,* 738 F.2d 424 (3rd Cir.1984)). We explained that such a rule is necessary to avoid rendering § 602 "virtually meaningless." *Id.* Without the rule, "[c]opyright owners would no longer have an exclusive right to distribute copies or phonorecords of works manufactured abroad, an interest clearly protected by § 602." *Id.* In essence, in *BMG Music* there was no first sale because the defendant purchased the copyrighted material *abroad.* Therefore, we concluded, the defendant importer did indeed infringe on the U.S. copyright when he imported and sold the phonorecords without the authorization of the U.S. copyright holder.

tribute copies or phonorecords under section 106.

**6.** The logical outcome of a ruling that the U.S. copyright owner is precluded from interfering with U.S. distribution of copies manufactured and lawfully sold abroad would be to deprive U.S. copyright holders of the power to authorize or prevent imports of the copies once the copies are sold abroad by the manufacturer. We acknowledge that serious policy considerations weigh on both sides of this debate, because of

implications for the so-called "gray market" of imported goods.

"Gray-market" goods, or "parallel imports," are genuine products possessing a brand name protected by a trademark or copyright. They are typically manufactured abroad, and purchased and imported into the United States by third parties, thereby bypassing the authorized U.S. distribution channels. *See K Mart v. Cartier,* 486 U.S. 281, 286–287, 108 S.Ct. 1811, 1815–1816, 100 L.Ed.2d 313 (1987).

*Id.*[7] The material facts of this case are nearly identical to those in *BMG Music.*

█ Drug Emporium amicus urges us to overrule *BMG Music.* It argues that the plain meaning, legislative history, interpretive case law, and policy considerations framing the statutes in question, all suggest that *BMG Music* was wrongly decided. Whether or not we agree with their arguments, *BMG Music* is binding authority in the 9th Circuit that can only be overturned through an en banc hearing. *U.S. v. Mandel,* 914 F.2d 1215, 1220–21 (9th Cir.1990); *see* 9th Cir.R. 35(1)–35(3) (providing procedures for en banc review).[8]

█ Alternatively, Drug Emporium asks us to distinguish *BMG Music.* The reply brief notes that Drug Emporium was not the importer of Amarige, as was the defendant in *BMG Music;* rather, Drug Emporium purchased its Amarige from a wholesaler here in the United States. *See* discussion *supra,* pp. 479–80, regarding standing. This is not a material distinction because the purchaser of illegally imported copies has no more author-

ity to distribute copies than does the original importer. *See* H.R.Rep. No. 1476, at 79, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5693 ("any resale of an illegally pirated phonorecord would be an infringement"). Drug Emporium therefore had no more authority to distribute the copyrighted Amarige box design than did the original importer. Nothing had happened to divest Givenchy USA of its "exclusive rights." 17 U.S.C. § 106 ("the owner of copyright ... has the exclusive rights" to authorize distribution of copies).

2. Relevance of Givenchy USA's status as a subsidiary of Givenchy France:

█ In its better argument, Drug Emporium asks us to distinguish *BMG Music* because in the case before us the U.S. copyright owner, Givenchy USA, is the wholly owned subsidiary of the foreign manufacturer of Amarige, Givenchy France. There is nothing in the plain language of § 602, its legislative history, or case law that suggests that subsidiaries of foreign manufacturers should be treated any differently from other U.S. copyright holders.[9] Nevertheless, Drug

---

7. In *Sebastian Intern. v. Consumer Contacts (PTY),* 847 F.2d 1093, 1098–99 (3rd Cir.1988), the Third Circuit held that the first sale doctrine of § 109(a) superseded the import right of § 602(a) where a domestic manufacturer first exported its materials and then attempted to invoke the copyright laws to enjoin a third party from importing the copyrighted goods. In *BMG Music* we explicitly declined to speculate about how we would decide the facts in *Sebastian.* We again decline to do so.

8. We note, however, that the strongest argument against applying *BMG Music* is that some of its language, applied literally to circumstances not before us in *BMG Music,* would lead to absurd and unintended results. *BMG Music* need not be overturned to avoid those undesirable results.

In *BMG Music,* we stated: "The words 'lawfully made under this title' in § 109(a) grant first sale protection only to copies legally made and sold in the United States." 952 F.2d at 319. Amici and some courts have pointed out that this broad language, if taken literally, would render the first sale doctrine wholly inapplicable to foreign manufactured goods, even after the goods have been lawfully imported into the United States with the authorization of the U.S. copyright holder. *See, e.g., Parfums Givenchy v. C & C Beauty Sales,* 832 F.Supp. 1378, 1386 (C.D.Cal. 1993) (citing 1 Paul Goldstein, Copyright § 5.6.1, at 604). This would mean that foreign manufactured goods would receive greater copyright pro-

tection than goods manufactured in the United States because the copyright holder would retain control over the distribution of the foreign manufactured copies even after the copies have been lawfully sold in the United States. We agree that such a result would be untenable, and that nothing in the legislative history or text of § 602 supports such an interpretation. *See* H.Rep. No. 94–1476, 94th Cong., 2nd Sess. 170 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5786 ("any unauthorized importer of copies or phonorecords *acquired abroad* could be sued for damages and enjoined from making any use of them...." (Emphasis added.)).

Our reliance on *BMG Music* today should not be read as an endorsement of any such broad extension of that case beyond its facts. Those facts did not include any attempt to preclude the sale of copies of foreign manufactured goods that had been lawfully obtained *in the U.S.* from the U.S. copyright holder. We merely follow *BMG Music* in holding that sales *abroad* of foreign manufactured United States copyrighted materials do not terminate the United States copyright holder's exclusive distribution rights in the United States under §§ 106 and 602(a).

9. Amicus Coalition for Competitive Imports makes an intriguing, though ultimately futile, argument for the related proposition that case law distinguishes between a sale by the copyright owner *itself,* which is a defense against copyright infringement, and a sale by *licensees,* which

Emporium asks us to analogize from trademark cases interpreting § 526 of the Tariff Act of 1930, 19 U.S.C. § 1526, and §§ 32 and 43 of the Lanham Trademark Act, 15 U.S.C. §§ 1114 & 1125. As explained below, the cases cited by Drug Emporium hold that wholly owned U.S. subsidiaries of foreign manufacturers cannot invoke *tariff* or *trademark* protections to prevent third parties from importing goods manufactured by the parent company. *See, e.g., K Mart v. Cartier*, 486 U.S. 281, 294, 108 S.Ct. 1811, 1819, 100 L.Ed.2d 313 (1988) (wholly owned subsidiary of foreign manufacturer cannot invoke § 526 of the *Tariff Act* of 1930, 19 U.S.C. § 1526, to prevent third parties from competing in the domestic market by buying the foreign parent company's trademarked goods abroad and importing them here); *NEC Electronics v. CAL Circuit Abco*, 810 F.2d 1506, 1509 (9th Cir.) (wholly owned subsidiary of foreign manufacturer could not invoke §§ 32 and 43 of the *Lanham Trademark Act*, 15 U.S.C. §§ 1114 & 1125, to prevent third party from importing parent company's product), *cert denied*, 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 108 (1987).

The problem with Drug Emporium's suggested analogy is that the Copyright Act has a purpose, scope, and statutory scheme different from either the Tariff or Lanham Trademark Acts. As a result, as explained below, the reasoning of the cases cited by Drug Emporium is inapplicable to the sections of the Copyright Act at issue in the case before us.

### a. The Tariff Act

Section 526(a) of the Tariff Act of 1930 prohibits the unauthorized importation of foreign-made merchandise bearing a registered trademark owned by a United States corporation. 19 U.S.C. § 1526(a).[10] In *K Mart*, the Supreme Court addressed the question whether a wholly owned United States subsidiary of a foreign manufacturer could invoke the protections of the § 526 of Tariff Act to prevent competition from third parties who imported the products manufactured by the parent company. The Supreme Court held that wholly owned subsidiaries could *not* invoke § 526 of the Tariff Act. There were two reasons for this determination, neither of which helps Drug Emporium.

First, the Court deferred to a U.S. Customs Service regulation that interpreted ambiguous statutory language that limited Tariff Act § 526's benefits to merchandise bearing a trademark "owned by" a United States citizen or company. This rationale

---

might not be a defense. The Amicus argues that *BMG Music* may be distinguished from the case at bar on this ground.

Case law, though ambiguous, does not squarely hold that there is a dichotomy between sales by the copyright holder itself and by its licensees. *See United States v. Atherton*, 561 F.2d 747, 751 (9th Cir.1977) (rejecting any distinction between sales by owners and by licensees in the context of a *criminal* prosecution for copyright infringement). *But cf. Platt & Munk v. Republic Graphics*, 315 F.2d 847, 854 (2nd Cir.1963) (Friendly, J.) (some transfers of title of particular copies do not qualify as first sales; test for whether a first sale has occurred is whether the copyright holder has received a just reward for the use of the copyrighted article).

The second problem with the amicus argument is that it fails to distinguish between imports and domestic goods. The rationale of *BMG Music*, by which we are bound, is that sales *abroad* do not constitute a defense to copyright infringement under § 602(a). Under *BMG Music*, the relationship between the copyright holder and the seller abroad is irrelevant.

Finally, amicus attempts to buttress its argument by reference to the legislative history of the

Computer Software Rental Amendments Act of 1990, Pub.L. 101–650 § 803, 104 Stat. 5089. *See* H.R.Rep. No. 101–735, 101st Cong., 2d Sess. 9, *reprinted in* 1990 U.S.C.C.A.N. 6935, 6940. But the provision cited by amicus, 17 U.S.C. § 109(e), is not relevant here. That provision was designed to overrule *Red Baron–Franklin Park v. Taito Corp.*, 883 F.2d 275 (4th Cir.1989), *cert. denied*, 493 U.S. 1058, 110 S.Ct. 869, 107 L.Ed.2d 952 (1990), which held that the first sale doctrine does not apply to the public performance right under § 106(4). Nothing suggests that Congress intended to comment on or change the scope of § 602(a) when it passed § 109(a).

10. Section 526(a) provides in relevant part:

[I]t shall be unlawful to import into the United States any merchandise of foreign manufacture if such merchandise ... bears a trademark owned by a citizen of, or by a corporation or association created or organized within, the United States, and registered in the Patent and Trademark Office by a person domiciled in the United States, under the [applicable] provisions unless written consent of the owner of such trademark is produced at the time of making entry.

does not help Drug Emporium because Copyright Act § 602 is not restricted by its terms to United States citizens or companies.

Second, the Court relied on the purpose of Tariff Act § 526, which is to protect domestic companies against foreign competition, *see K Mart*, 486 U.S. at 297, 108 S.Ct. at 1820–21 (Brennan J., concurring) (the structure of § 526 "bespeaks an intent, characteristic of the times, to protect only domestic interests"). To allow wholly owned subsidiaries of foreign companies to invoke § 526 would allow the foreign parent company to enjoy the competitive benefits that Congress intended to accrue only to domestic companies. The Tariff Act protections "are fragile barriers indeed if a foreign manufacturer might bypass them by the simple device of incorporating a shell domestic subsidiary and transferring to it a single asset—the United States trademark." *Id.* This second rationale is also inapplicable to the Copyright Act. The import restrictions of Copyright Act § 602 were intended to protect U.S. copyright holders from pirated articles as well as gray market copies,[11] not to give preferential treatment to domestic companies over foreign companies. *See* Copyright Act House Report, at 5785 ("Section 602 ... deals with two separate situations: importation of 'piratical' articles ... and unauthorized importation of copies ... that were lawfully made"). In marked contrast to the Tariff import restrictions, which only protect domestic companies, the copyright laws are also available to protect foreign beneficial owners of U.S. copyrights, regardless of nationality. *See* 17 U.S.C. § 104(b) (foreign author may claim U.S. copyright if domiciliary or national of Berne Convention, Universal Copyright Convention ("U.C.C."), or other treaty nation, or if the work was first published in the U.S. or in a Berne, U.C.C. or other treaty nation); *see also* 5 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 5.05[D] (1993) (author who is a citizen or alien eligible to claim copyright may assign copyright to ineligible alien, who as assignee may fully enforce the copyright). In fact, as Givenchy USA points out, Givenchy France would have been eligible to assert U.S. copyright protection for the Amarige box design for *itself* had it not assigned its U.S. copyright interest to Givenchy USA. Givenchy France therefore had no need to resort to a "shell" United States subsidiary to enjoy United States copyright protection.

### b. The Lanham Trademark Act

The purpose of the Lanham Trademark Act, Pub.L. 87–772, 15 U.S.C. §§ 1051–1127 (the "Lanham Act"), is to prevent consumer confusion or deception about the origin or make of a product. *NEC Electronics*, 810 F.2d at 1509. There is no statutory equivalent in the Lanham Act to § 602(a) of the Copyright Act. But since *Bourjois v. Katzel*, 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923), the courts have interpreted §§ 32 & 43(a), 15 U.S.C. §§ 1114 & 1125(a), in a manner that protects U.S. trademark owners from competition from goods manufactured and purchased abroad and imported without the consent of the U.S. trademark owner. *NEC Electronics*, 810 F.2d at 1510.[12] This *Katzel* import protection is functionally equivalent to the Copyright Act's § 602, in that it allows U.S. companies to sue third parties that attempt to import lawfully obtained foreign manufactured goods without the authorization of the U.S. registered trademark owner.

The rationale behind the judicially created import protection described in *Katzel* is twofold: (1) it preserves the benefit of the bargain for United States companies that purchase domestic trademarks from foreign manufacturers, by preventing the foreign manufacturers from "evading the purpose of the transfer" by selling to third parties for import into the United States, *Katzel*, 260 U.S. at 691, 43 S.Ct. at 245; and (2) it preserves the integrity of the U.S. mark by

---

11. See fn. 6, *supra* for a definition of gray market goods.

12. Section 32 of the Lanham Act, 15 U.S.C. § 1114 provides registered trademark owners with a right of action against unauthorized use of the likeness of a mark in a manner "likely to cause confusion or to cause mistake or to deceive."

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides for civil liability for marketing goods bearing "a false designation of origin."

preventing the "importation of foreign-purchased goods whose quality and contents were beyond [the U.S. trademark owner's] control." *NEC Electronics*, 810 F.2d at 1509. Each of these rationales "presuppose[s] the American owner's real independence from the foreign manufacturer." *Id.* Such independence is absent where the U.S. company asserting the right to sue third party importers under *Katzel* is the wholly owned subsidiary of the foreign manufacturer. We have therefore created an exception to *Katzel* where there is a parent-subsidiary relationship between the U.S. trademark owner attempting to avoid competition from third party importers and the foreign manufacturer. *Id.* at 1510. It is this exception that Drug Emporium would have us apply to § 602 of the Copyright Act.

But the rationale for the parent-subsidiary exception to the import protection of the Lanham Act is inapplicable to copyright law. There is no indication that § 602 of the Copyright Act was particularly intended to give domestic copyright holders the benefit of their bargains with foreign manufacturers, nor that it was intended to protect U.S. copyright holders' control over the quality and contents of the copyrighted goods. In fact, the independence of the U.S. copyright holder from the foreign manufacturer is irrelevant to the concern underlying § 602 of the Copyright Act, which, as discussed above, is intended to give U.S. copyright holders protection against pirated and gray market imports.

In sum, nothing in the Copyright Act, the Lanham Act, or the Tariff Act, suggests that we should create an exception to the importation right granted to U.S. copyright holders by § 602(a) for U.S. subsidiaries of foreign manufacturers.

**AFFIRMED.**