**PHILIP MORRIS INCORPORATED,**
Plaintiff,

v.

**CIGARETTES FOR LESS,**
et. al., Defendants.

No. C–99–20634 JF.

United States District Court,
N.D. California,
San Jose Division.

Aug. 30, 1999.

Louisa Weix, San Francisco, CA, William Goines, San Jose, CA, for Plaintiff.

Ann Peskoe, Hector Chincilla, Joseph Ehrlich, for Defendants.

## ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

FOGEL, District Judge.

This motion for preliminary injunction, brought by Plaintiff Phillip Morris Incorporated (PMI) and argued August 11, 1999, raises important issues relating to the purposes and scope of trademark protection. The Court must determine whether the provisions of the Lanham Act[1] properly may be utilized to prevent confusion between two similarly packaged products when both products are manufactured and packaged by the Plaintiff and when the Plaintiff intended one product for domestic distribution and the other for foreign distribution. The Court believes that resolution of this issue turns upon whether domestic and foreign distribution are under common control of the same entity. In this case there is substantial uncertainty not only as to whether there is such common control but also as to whether there is any relevant confusion of consumers in the first instance. Nevertheless, the Court concludes that limited preliminary injunctive relief is appropriate, as is described more fully below.[2]

## I. BACKGROUND

### A. The Alleged Infringement

PMI manufactures "Marlboro" brand cigarettes for distribution in the United States ("domestic cigarettes") and also manufactures cigarettes purportedly intended only for foreign distribution ("foreign cigarettes"). The packaging of both foreign and domestic cigarettes bears the same trademarks, namely the "Marlboro" brand name and a red and white "roof" design. PMI owns both of these trademarks in the United States and claims that Defendants are infringing its trademark rights by selling foreign cigarettes domestically.

PMI asserts that the domestic sale of foreign cigarettes both damages the goodwill associated with its trademarks and also confuses consumers because the foreign Marlboros differ materially from domestic Marlboros. The asserted differences include the fact that foreign cigarettes, unlike their domestic counterparts, do not come with Marlboro "Miles,"[3] and are not subject to certain post-manufac-

---

1. The Lanham Act is codified at 15 U.S.C. § 1051 et seq.

2. The motion is opposed by 1) National Tobacco Distributors; 2) Michael Kamar d/b/a Sell for Less and Sell For Less Cash & Carry (SFL); and 3) Sabek, Inc., R.A.T. Cigarette Club and Steve Sabahi (cumulatively "Sabek Defendants") Several other named Defendants have stipulated to an injunction.

3. In 1992, PMI introduced a program (the "Miles program") allowing consumers to redeem Universal Product Codes from domestic cigarette packages in exchange for merchandise. Since the inception of the Miles program, PMI has received over 30 million redemption requests, redeemed over 57 billion Miles, and delivered over 114 million items of merchandise to participating consumers.

turing quality control measures, including PMI representatives' routine inspections of the facilities of wholesalers and retailers of domestic Marlboro cigarettes and replacement of any products found to be damaged or otherwise substandard.

The foreign Marlboros also differ from the domestic version by including the phrase "U.S. Tax Exempt For Use Outside U.S." and by displaying the name of an affiliated company, Philip Morris Products, Inc. (PMP), on the packs instead of that of PMI. In addition, Plaintiff asserts that "home made looking" stickers have been applied to the packaging of the foreign cigarettes allegedly sold by Defendants. These stickers are imprinted with the mandatory Surgeon General's health warning.

### B. Relationships Between Relevant Entities

PMI explains that it produces foreign cigarettes in its capacity as a contract manufacturer for PMP and that these cigarettes are manufactured pursuant to specifications provided by PMP.[4] While PMI owns the Marlboro and roof trademarks in the United States, PMP owns these marks in foreign jurisdictions and distributes and sells foreign cigarettes.

It is not clear from the parties' submissions whether PMP exports foreign cigarettes for sale abroad, whether it sells the cigarettes domestically employing some sort of contractual device to prevent domestic resale or whether some other business model is employed. The details of the corporate relationship between PMI and PMP also are unclear. PMI has provided testimonial evidence to the effect that PMI and PMP both ultimately can both trace their lineage back to Philip

Morris Companies Inc. Philip Morris Companies Inc., according to PMI, is a holding company which owns PMI and also owns a company called Philip Morris International Inc., which, in turn, owns PMP. In other words, PMI contends that PMP is its first cousin. No information is provided regarding the terms of any contractual relationship between PMI and PMP pertaining to the use of the Marlboro name and "roof" design.

## II. LEGAL STANDARD

■ In the Ninth Circuit, a party seeking a preliminary injunction must show either (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and the balance of hardships tipping in the movant's favor. *See Roe v. Anderson,* 134 F.3d 1400, 1401–02 (9th Cir.1998); *Apple Computer, Inc. v. Formula Int'l, Inc.,* 725 F.2d 521, 523 (9th Cir.1984). These formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. *See Roe,* 134 F.3d at 1402.

■ A showing of likely success on the merits gives rise to a presumption of irreparable harm in copyright and trademark cases. *See Triad Systems Corp. v. Southeastern Express Co.,* 64 F.3d 1330, 1335 (9th Cir.1995); *International Jensen, Inc. v. Metrosound U.S.A., Inc.,* 4 F.3d 819, 827 (9th Cir.1993).

## III. DISCUSSION

Plaintiff seeks relief in this action pursuant to Sections 32(1) and 43(a) of the Lanham Act, through 15 U.S.C § 1125(c) and through California's unfair competition

---

**4.** Plaintiff does not assert that the composition or construction differs as between the domestic and foreign cigarettes and does not gainsay Defendants' corresponding conclusion that the cigarettes are identical at the time of production. The Court therefore assumes for purposes of this motion that any specifications provided by PMP are identical to the specifications corresponding to PMI's domestic cigarettes.

laws.[5] Section 32(1) of the Lanham Act protects the owners of federally registered marks from unauthorized commercial use of similar marks likely to cause confusion. 15 U.S.C. § 1114(1). Section 43(a) prohibits the use of "any word, term, name, symbol, or device ... [¶] likely to cause confusion, ... as to the affiliation, ... of such person with another person, or as to the origin, sponsorship, or approval of his or her goods." 15 U.S.C. § 1125(a). Additionally, 15 U.S.C. § 1125(c) provides that the holder of a "famous mark shall be entitled, subject to the principles of equity ... to an injunction against another person's commercial use," in order to avoid dilution of the mark. There is no assertion that California's unfair competition laws require a different analysis than that indicated by federal law, and for purposes of the instant motion the Court will assume that they do not.

■ A trademark infringement claim may be asserted by the owner of a registered trademark against any defendant who "without the consent of the registrant, ... uses 'in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark' which 'is likely to cause confusion ....'" *Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 972 (11th Cir. 1983), *quoting* 15 U.S.C. § 1114(1). In cases involving identical looking goods originally intended to be marketed in disparate regions, likelihood of confusion may be shown by proof that the goods are

materially different from one another. *See Societe Des Produits Nestle, S.A. v. Casa Helvetia*, 982 F.2d 633 (1st Cir.1992); *Original Appalachian Artworks, Inc. v. Granada Elecs., Inc.*, 816 F.2d 68 (2d Cir. 1987).[6] To prevail in this case PMI first must establish that the Lanham Act applies to the category of facts at issue and then must show that its trademark rights have been infringed by Defendants.

### A. Whether the Lanham Act Applies to the Facts of this Case

PMI contends that the Lanham Act applies because domestic consumers purchasing foreign cigarettes mistakenly believe that the cigarettes they are purchasing come with "Miles" and have been stored in a manner consistent with PMI's quality standards. Defendants argue in opposition that the Lanham Act does not apply because 1) there is no consumer confusion as to the *source* of the goods, which were in fact manufactured by PMI; 2) PMI and PMP are commonly controlled and are themselves responsible for injecting the similarly packaged products into the marketplace; and 3) the first-sale doctrine bars PMI from using the Lanham Act to limit downstream distribution of foreign cigarettes after selling them to PMP.

### 1. Whether the Lanham Act Requires Confusion as to Physical Source

Defendants appear to argue that the Lanham Act protects only against confu-

---

**5.** Section 43(a) of the Lanham Act is codified at 15 U.S.C. § 1125(a). 15 U.S.C. § 1125(c) was enacted subsequently. For ease of communication, references herein to the Lanham Act contemplate not only Sections 32 and 43 thereof but also 15 U.S.C. § 1125(c).

**6.** Plaintiffs refer a number of "gray market" cases which involve "a foreign-manufactured good, bearing a valid United States trademark, that is imported without the consent of the United States trademark holder." *K Mart Corporation v. Cartier, Inc.*, 486 U.S. 281, 285, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988); *see also, e.g., Nestle*, 982 F.2d. at 635. Defen-

dants take issue with the applicability of these cases by arguing that foreign cigarettes do not fit the definition of "gray market" goods because they are not manufactured abroad and it is unclear whether they have ever left this country at all.

In the opinion of the Court, emphasis upon latent material differences as an indicia of the likelihood of confusion is dictated by reason whenever visual identity of competing products is supplied as a given (as it is here). It is of little or no consequence whether the term "gray market" is employed.

sion as to the source of a product and that there is no such confusion here because the domestic and foreign cigarettes both share the same source: PMI's manufacturing facilities. It is difficult to say with certainty whether Defendants' interpretation of the Lanham Act is anachronistic. Until 1962 the Lanham Act clearly did apply only when there was likely confusion "as to the source of origin of ... goods or services." 15 U.S.C. § 1114(1) (amended 1962). However, the quoted language was deleted in 1962, and currently, § 32(1)(a) of the Lanham Act refers without qualification to use of marks "likely to cause confusion, or to cause mistake, or to deceive."[7] According to the Second Circuit, the effect of the amendment in 1962 was "to outlaw the use of trademarks which are likely to cause confusion ... of any kind, not merely of purchasers nor simply as to source of origin." *Syntex Laboratories Inc. v. Norwich Pharmacal Co.,* 437 F.2d 566, 568 (2d Cir.1971).

On the other hand, the reference in *Syntex* to "confusion ... of any kind," must be tempered by the fact that confusion falls under the rubric of § 32 only if it is caused by a "reproduction, counterfeit, copy, or colorable imitation of a registered mark." 15 U.S.C. § 1114(1)(a). Thus when NEC–USA, owner of the United States trademark rights for NEC computer chips, sued to enjoin domestic sales of chips purchased abroad from NEC–Japan, the Ninth Circuit found that there was no Lanham Act violation because the NEC mark was "genuine." *NEC Electronics v. CAL Circuit Abco,* 810 F.2d 1506, 1509–11 (9th Cir. 1987). Notably, the determination of genuineness in *NEC* revolved largely around the fact that NEC–Japan and NEC–USA were under common control such that the importer was not "selling goods 'of one make under the trade mark of another.'"

*Id.* at 1510 *quoting Champion Spark Plug Co. v. Sanders,* 331 U.S. 125, 128, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947).

■ In light of the analysis in *NEC,* it may well be that to state a Lanham Act violation in the Ninth Circuit confusion as to source effectively is required: in general, there is no Lanham Act violation if the goods at issue are genuine, and genuiness hinges on the element of common control as an indicator of whether the goods are sold "under the trade mark of another." *NEC,* 810 F.2d at 1510 *quoting Champion,* 331 U.S. at 128, 67 S.Ct. 1136; *accord Sebastian International v. Longs Drug Stores Corporation,* 53 F.3d 1073 (9th Cir. 1995). At this juncture, however, this Court need not resolve the question of whether *NEC* and *Sebastian* require by definition that a Lanham Act violation still be premised upon confusion "as to the source" of goods. Rather, it is sufficient to recognize that under current Ninth Circuit law, the sale of products bearing genuine trademarks does not violate the Lanham Act and that genuineness turns in some manner on the issue of common control of the goods.

### 2. Whether Lanham Act Claims are Precluded Because of Common Control

■ Defendants argue that PMI cannot show a probability of success on the merits of this action because PMI and PMP are under common control and therefore are precluded from stating a valid Lanham Act claim in this circuit. PMI denies that it and PMP are under common control. It further argues that common control would not be fatal in any event because foreign and domestic cigarettes are materially different from one another, while the comput-

---

7. Section 43(a) may well be more limited as it specifically delineates the types of confusion with which it is concerned, e.g., confusion as to affiliation or source. Because the trade-

marks at issue in this litigation are registered United States trademarks, the potentially broader application of § 32 sets the limiting factor for this analysis.

er chips at issue in *NEC* were identical. *NEC*, 810 F.2d at 1510. PMI also points to post-*NEC* district court decisions in which the possibility of common control did not precluded injunctive relief.[8]

The importance of common control in the *NEC* decision can be understood fully only when *NEC* is read in context with the binding precedent which it distinguished, namely *A Bourjois & Co. v. Katzel*, 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923). Justice Holmes' brief opinion in *Katzel* dealt with a controversy in which the plaintiff had purchased "for a large sum" the United States trademarks associated with face powder from a French based third-party company. "The defendant, finding that the rate of exchange enabled her to do so at a profit, bought a large quantity of the same powder in France," and sold it domestically "in the French boxes which closely resemble those used by the plaintiff." *Id.* at 691, 43 S.Ct. 244.

Justice Holmes wrote that "[t]here is no question that the defendant infringes the plaintiff's rights unless the fact that her boxes and powder are the genuine product of the French concern gives her a right to sell them in the present form." *Id.* at 691, 43 S.Ct. 244. The Court concluded that the defendant did not enjoy such a right because the French manufacturer could not itself legally have sold its product in the United States after the transfer of its United States trademark, and could not have "conveyed [its] goods [to the defendant] free from the restriction to which [it was] subject."

Like *Katzel*, the *NEC* case involved a trademark infringement claim against a defendant selling merchandise legally obtained abroad and imported into the United States. The court in *NEC* distin-

guished the holding in *Katzel* by gleaning from "Justice Holmes's characteristically laconic opinion ... two rationales," which did not pertain to the facts of *NEC*, 810 F.2d at 1509. Specifically, the court perceived the holding in *Katzel* to be dependent upon 1) an "arm's-length contract [between the plaintiff and] the manufacturer," and; 2) the fact that "the plaintiff had become the true source of the trademarked goods," in that it "might have chosen to sell a different product under the assigned mark." *NEC*, 810 F.2d at 1509; *accord Parfums Givenchy, Inc. v. Drug Emporium*, 38 F.3d 477, 484 (9th Cir. 1994).

The Ninth Circuit panel in *NEC* noted that both distinctions "presuppose the [United States] owner's real independence from the foreign manufacturer." *NEC*, 810 F.2d at 1509. Because the plaintiff in *NEC* and the foreign manufacturer from whom the defendant had obtained its stock were "commonly controlled," the court found that the required "real independence" was lacking. *Id.* at 1510. In considering the implications of common control, including antitrust implications, the court implicitly recognized that the real party in interest was the foreign parent corporation, notwithstanding that the case had been brought in name by the United States subsidiary:

> If [the parent corporation] chooses to sell abroad at lower prices than those it could obtain for the identical product here, that is its business. In doing so, however, it cannot look to United States trademark law to insulate the [United States] market or to vitiate the effects of international trade. This country's trademark law does not offer [the plaintiff's parent corporation] a vehicle for

**8.** Published cases cited by Plaintiff which appear to fall into this category include: *Phillip Morris Incorporated v. Allen Distributors*, 48 F.Supp.2d 844 (S.D.Ind.1999); *PepsiCo Inc. v. Reyes*, 50 U.S.P.Q.2d 1696, 1999 WL 803736 (C.D.Cal.1999); *PepsiCo Inc. v. Torres*, 27 U.S.P.Q.2d 1948 (C.D.Cal.1993); and *Pepsico. Inc. v. Giraud*, 7 U.S.P.Q.2d 1371 (D.P.R.1988).

establishing a worldwide discriminatory pricing scheme simply through the expedient of setting up [a United States] subsidiary with nominal title to its mark.

*Id.* at 1510.

In light of *NEC* and *Katzel,* PMI cannot prevail in its argument that common control is rendered irrelevant if the foreign and domestic cigarettes are materially different from one another. The pertinent inquiry in both cases was not whether material differences existed between the products there at issue, but whether the domestic plaintiff truly was independent from the foreign manufacturer. If not then "[the plaintiff] *might have* chosen to sell a different product under the assigned mark [and] the foreign producer *might have* begun selling an inferior product abroad," thus reducing the value of the trademark to both as an indication of quality and as a valuable vessel of goodwill. *NEC,* 810 F.2d at 1509, *emphasis* added. In contrast, where there is common control rather than true independence, then the existence of material differences does not give rise to trademark infringement because the goodwill associated with the trademark remains under the control of the trademark owner, serving one of the chief purposes of the Lanham Act. In turn, where trademark ownership and control over goodwill are vested in the same concern and quality nevertheless is inconsis-

tent, consumers accurately will conclude that a particular mark is an unreliable indicator of quality, and the Lanham Act's purpose of informing the consumer is also served.[9] In short, PMI's assertion that foreign and domestic cigarettes differ materially, in itself, does not distinguish this case from *NEC.*

PMI also maintains that there is no common control linking PMI and PMP. In the opinion of this Court, PMI falls far short of establishing a "likelihood" that it will prevail on this point. Its sole evidence is a declaration which indicates, as already stated, that the two companies merely are first cousins and that they have "different officers and directors."[10] Also weighing somewhat against PMI's assertions of independence is the apparent common knowledge of PMI and PMP concerning the specifications of Marlboro cigarettes.[11]

PMI's position is not aided by its citation to several post-*NEC* cases where injunctive relief has issued, arguably in spite of common control. Most conspicuously, PMI relies upon the recent case of *Phillip Morris Incorporated v. Allen Distributors, Inc.,* 48 F.Supp.2d.844 in which the district court issued a preliminary injunction on the basis of allegations similar to those at issue here. The persuasive value of *Allen Distributors* is limited, however because *NEC* is not controlling in the Southern District of Indiana. In fact, the *Allen*

9.  More often, the Lanham Act is characterized as providing consumers with an indication of consistent rather than inconsistent quality. Thus it is by implication that the Lanham Act serves to warn consumers of a product's inconsistent quality. Ultimately, the validity of a trademark may be challenged based upon a trademark owner's failure to police his product and achieve consistent quality.

10.  These assertions are ambiguous. PMI and PMP conceivably each could have five person boards of directors with three of the directors in common without rendering inaccurate the claim of "different officers and directors." Also, the relationship between the two companies and Philip Morris Companies Inc., their

common root, is left unaddressed except for conclusory assertions to the effect that the root organization merely is a holding company which "does not conduct any business."

11.  There currently is no argument or showing concerning whether the apparently identical specifications implicate a sharing of trade secrets or whether such sharing may merely evince a confidentiality agreement rather than common control. Thus, the apparent identity of specifications has not been given great weight by the Court; however, PMI has not placed significant counter-weights on the scales of equity either.

*Distributors* court explicitly considered the Ninth Circuit's decision in *NEC* but ultimately was persuaded by the contrary authority of *Lever Brothers Co. v. United States* (*Lever II* ), 981 F.2d 1330 (D.C.Cir. 1993) and *Lever Brothers Co. v. United States* (*Lever I* ), 877 F.2d 101 (D.C.Cir. 1989).

Other district court cases cited by PMI, some of them decided by trial courts within the Ninth Circuit, either make no mention of *NEC* or do not otherwise discuss common control. *Cf., Reyes,* 50 U.S.P.Q.2d 1696, 1999 WL 803736. Obviously, cases which do not address the issue at bar are of little persuasive value.

### 3. Whether Lanham Act Claims are Precluded by First Sale Doctrine

Defendants also assert that the Lanham Act is rendered inapplicable by the first sale doctrine even absent common control of PMI and PMP. "Beginning with *Prestonettes, Inc. v. Coty,* 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731, [ ](1924), courts have consistently held that, with certain well-defined exceptions, the right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product." *Sebastian International,* 53 F.3d at 1074. However, the courts also must abide by the "judicially created import protection described in *Katzel.*" *Parfums Givenchy,* 38 F.3d at 484. The juxtaposition of these two doctrines presents a potential conflict analogous to one addressed by the Ninth Circuit panel in *Parfums Givenchy.* In that case, the court grappled in the copyright context with the difficulties of "[h]armonizing the first sale doctrine and the importation

right." The court, relying upon its earlier decision in *BMG Music v. Perez,* 952 F.2d 318 (9th Cir.1991) concluded that the first sale doctrine could not preclude protection to a copyright owner when the first sale occurred outside the United States; the copyright owner's exclusive statutory right of importation otherwise would become a virtual dead letter.

The Lanham Act differs from the Copyright Act in that it specifically delineates neither an exclusive import right nor a first sale limitation. Nevertheless, as already noted, the Supreme Court in *Katzel* interpreted federal trademark law to provide certain import protections even where there evidently had been a first sale abroad. Moreover, one year later in *Prestonettes,* Justice Holmes wrote that the Court's application of a first sale bar in that case held "nothing . . . contrary," to what he had written in *Katzel.* Consequently, *Katzel,* when it applies, indicates an exception to the first sale doctrine.[12] *Contra Summit Technology, Inc. v. High–Line Medical Instruments Company, Inc.,* 922 F.Supp. 299 (holding that "[t]he mere fact that [the plaintiff] sold its goods abroad rather than domestically does not create an exception to the 'first sale' doctrine," but failing to cite to *Katzel,* 260 U.S. 689, 43 S.Ct. 244).

Because the applicability of the first sale doctrine is dependent at least upon the inapplicability of *Katzel* 's judicial gloss on federal trademark law, the pertinent inquiry, as in the preceding subsection, remains whether PMI and PMP are under common control.[13]

### B. Whether, if the Lanham Act Applies, it has been Violated

At least for purposes of this motion, the conduct of the Defendants and PMI's own-

---

**12.** In *Parfums Givenchy* the court demonstrated the better part of valor explicitly by declining to "speculate" whether a different analysis may apply as between cases where the first sale was made outside the country (as in *Parfums Givenchy* ) and cases where a plaintiff first exported his good, and then sought to enjoin reimportation. It is yet too early to tell

whether this subtlety will require resolution here in the trademark context.

**13.** PMI also attempts to invoke the so called "quality control" exception to the first sale doctrine. At this point, the Court does not believe that PMI's factual showing concerning the effects of quality control warrant the in-

ership of the relevant trademarks does not appear to be disputed. Consequently, if the Lanham Act applies, the determination of whether it has been violated turns on whether domestic and foreign cigarettes differ materially in such a way that consumers are likely to be confused, and/or whether the goodwill associated with PMI's trademarks is likely to be diminished.

This Court concludes that there is a possibility that PMI ultimately will be able to show a likelihood of confusion by virtue of the absence of "Miles" on foreign cigarette packs and the fact that a substantial number of consumers deem these "Miles" of some significance insofar as they actually redeem them for merchandise. As already noted in footnote 11, herein, this Court does not perceive substantial support for PMI's further claim that quality control issues constitute a material difference between the domestic and foreign cigarettes. A third proposed source of confusion—that PMI's customers may see the "U.S. Tax Exempt" marking on the foreign cigarettes and mistakenly conclude that PMI has attempted to deceive the Internal Revenue Service—also has little persuasive force.

## C. Whether and to What Extent the Equities Favor Granting Relief

■ So far, the Court has concluded that PMI has made some showing that the Lanham Act may apply and that if it applies then it may have been violated. The Court also has concluded that PMI has not as yet shown a likelihood of prevailing on either of these issues. Consequently, if relief is to be granted it must be formulated in such a manner as to be justified by the strength of PMI's showing relative to the nature and severity of the relative hardships the parties would suffer were relief to be granted. *See Roe,* 134 F.3d at 1402.

PMI argues that Defendants' sales of foreign cigarettes should be prohibited for the duration of this action. Defendants contend that based on Plaintiff's showing and the sliding scale standard applicable to the instant motion, Plaintiffs have failed to justify any relief whatsoever, but that if a preliminary injunction issues it should be limited to an order requiring point-of-sale disclosures rather than an outright prohibition of sales. There is testimony in the record on behalf of SFL Defendants that they effectively would be put out of business if prohibited from selling foreign cigarettes for a significant period and on behalf of Sabek Defendants that their customer base would be reduced significantly and that they would have to lay-off at least two employees. Further, SFL and Sabek Defendants, apparently invoking the laches doctrine, argue that PMI's unreasonable delay in addressing the domestic sale of foreign cigarettes precludes it from obtaining an injunction. Meanwhile, PMI points to the undeniably impressive value of its trademarks and corresponding potential for loss should the value of those trademarks be diluted.

Having weighed all of the arguments and evidence presented by the parties, the Court concludes that modest relief should be granted. Specifically, Defendants will be required to label foreign cigarettes so as to avoid the possibility of consumer confusion and any corresponding unjustified diminution of the value of PMI's trademarks. In light of the Court's conclusion that the "Miles" issue is the only one significantly likely to cause confusion, the required labeling will clarify only that no "Miles" are provided with the purchase of foreign cigarettes. The burden of this requirement should be marginal; if a significant loss of Defendants' business does result, then it could be inferred that Defendants' original sales volume in fact was due to consumer confusion, in which case

corporation of these alleged effects into the        instant legal analysis.

the equities decidedly would not weigh in Defendants' favor.

Defendants' evidence as to laches has little if any effect on the foregoing analysis. The evidence provided on this issue is of two varieties. The first simply is testimony to the effect that PMI has been aware of domestic sales of "foreign" cigarettes for several years. This evidence obviously does not accrue to the benefit of any particular defendant absent a more particularized showing of how PMI's enforcement efforts unreasonably were delayed with regard to that defendant. The second are disputed factual contentions as to whether the periodic interactions of a PMI representative and Sabek Defendants, between June of 1998 and the date this action was filed, constituted notice of and inaction in the face of Sabek Defendants' foreign cigarette sales. The existence of this factual issue underlying a potential laches defense is not significant enough to tip the scales further in Defendants' favor in light of the limited relief which the Court currently deems appropriate.

Nor is the Court convinced by PMI's argument that disclosure would be an inadequate or inappropriate preliminary remedy. In short, PMI contends that labeling is insufficient because even absent confusion over "Miles," its goodwill is at risk because the foreign cigarettes are not truly Marlboros. To the extent that this argument is of any potential force, it turns on the same issues of control already discussed; i.e., if the responsibility for inconsistency between identically marked products can be traced to a single source of control then under Ninth Circuit law, there is no justification for a remedy against Defendants because the responsibility lies with PMI.

### D. Determination of the Appropriate Bond

The Court expects that there will be minimal prejudice to Defendants as the result of this order, with the main effect being the cost of implementing the disclosure procedure described below. Consequently, PMI will be requested to post a nominal bond of $ 25,000. The amount of the bond is subject to modification upon a showing by any party that a different amount is warranted.

### IV. ORDER

Accordingly, it is hereby ordered that pending the trial of this action or until otherwise ordered by the Court, Defendants are enjoined and restrained from selling foreign cigarettes, as that term is defined herein, unless the following measures are taken:

a. All packs of foreign cigarettes sold or displayed must bear a sticker which conspicuously discloses "NO 'Miles' with these Cigarettes."

b. If the foreign cigarettes are sold by the carton, then the sticker must appear conspicuously on at least two sides of the carton, in addition to being placed on the front of each pack within the carton.

c. The word "NO" shall be in capital letters, and at least as large and conspicuous as the word "Miles."

This order shall be effective upon the posting of a bond in the amount of $25,000.